**Judah ROSENFELD, etc., et al.,
Plaintiffs-Appellants,**

**v.**

**E. R. BLACK et al., Defendants-
Appellees.**

**No. 767, Docket 35820.**

United States Court of Appeals,
Second Circuit.

Argued May 10, 1971.

Decided June 22, 1971.

William E. Haudek, New York City (Pomerantz Levy Haudek & Block, New York City, Abraham L. Pomerantz and Mordecai Rosenfeld, New York City of counsel), for plaintiffs-appellants.

Simon H. Rifkind, New York City (Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Paul J. Newlon, Mark H. Alcott, New York City, and Bruce S. Kaplan, New York City, of counsel), for defendants-appellees Lazard Freres & Co., Albert J. Hettinger, Jr., and Richard H. Mansfield.

White & Case, New York City (Thomas Kiernan, Morton Moskin, P. B. Konrad Knake, Jr., New York City, of counsel), for defendants-appellees Dun & Bradstreet, Inc., Moody's Investors Service, Inc. and Moody's Advisors & Distributors, Inc.

Sullivan & Cromwell, New York City, for defendant-appellee Alan H. Temple.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

FRIENDLY, Chief Judge:

The appeal here is by plaintiffs, stockholders in what was The Lazard Fund, Inc. ("the Fund"), a mutual fund organized in 1958 and registered under the Investment Company Act of 1940 ("the Act"). Their complaints, brought in the District Court for the Southern District of New York, sought, *inter alia*, an accounting of profits allegedly realized by Lazard Freres ("Lazard"), the organizer and investment adviser of the Fund, when, in 1967, it ceased to be the adviser and was replaced by Moody's Advisors & Distributors, Inc. ("Moody's A & D"), a wholly-owned subsidiary of Moody's Investors Service, Inc., which in turn was a wholly-owned subsidiary of Dun & Bradstreet, Inc. ("D & B"). The district court granted defendants' motion for summary judgment. The appeal raises an important question with respect to the obligations of an investment adviser that wishes to terminate its services to an investment company.

## I.

As noted, Lazard, a highly reputed investment banking firm, had organized the Fund in 1958. The initial offering was of 8,500,000 shares at a price to the public of $15 per share.[1] Although originally organized as a closed-end investment company, the terms of the initial public offering made the Fund "open-end" within § 5(a) (1) of the Act in the sense that the shares were redeemable, at a charge of 1% of the net asset value of the shares tendered for redemption. The Fund employed Lazard as investment adviser. The advisory contract, which conformed to the requirements of § 15(a) of the Act and was renewed on one occasion with directors' and thereafter with stockholders' approval, provided for quarterly fees which, translated to an annual basis, amounted to ½ of 1% on the first $100,000,000 of the Fund's average daily net assets, ⅜ of 1% on the next $50,000,000, and ¼ of 1% on any excess over $150,000,000. In return, Lazard was obligated not only to advise the Fund in respect of investments but also to provide necessary office facilities and personnel including corporate officers; its compensation was to be reduced by any amounts up to $50,000 per year paid by the Fund to members of its board of directors, executive committee or consultants.

The principal moving affidavit, by a Lazard partner, set forth the following: In contrast to most open-end investment

---

1. The issue was underwritten, with the proceeds realized by the Fund being $13.875 per share. Lazard was the underwriter with respect to 4,500,000 shares. Apparently a considerable portion of these was placed with customers of the firm.

companies, the Fund did not engage in a continuous public offering of its shares. The shrinkage attendant upon redemptions unaccompanied by sales was expected to be counteracted by an additional offering. However, developments in the mutual fund industry accelerated the shrinkage to such an extent that it would not likely be offset by such an offering. By the time of the events here in question, the number of shares had decreased to 5,304,711 and net assets had declined to some $85,000,000. In light of this, Lazard concluded that the best interests of the Fund's stockholders would be served if the Fund were to engage in a continuous offering of its shares and institute various new investment plans and programs of the type provided by competing funds. However, it would have been contrary to Lazard's traditional policies and mode of operation to create the organization needed to that end. In 1966, when Lazard learned that Moody's Investors Service, Inc., which managed more than $4 billion worth of investments for customers as investment adviser, was considering the possibility of entering the mutual fund area, it felt that an ideal solution to the Fund's problem might be in sight.

With the knowledge and approval of the Fund's directors, Lazard approached D & B. The result was a series of agreements. One provided for the "merger" of the Fund into Moody's Capital Fund, which Moody's Investors Service would organize with a capital of $100,000 in cash and Government securities. Each share of the Lazard Fund was exchangeable for one share of the Capital Fund having the same net asset value as one share of the Lazard Fund, and the shares of the Capital Fund owned by Moody's Investors Service prior to merger would also be converted into shares of the surviving corporation having the same net asset value as the shares issued to Lazard Fund stockholders.[2] The Capital Fund would employ Moody's A & D both

as investment adviser, on substantially the same terms previously provided with respect to Lazard, and as exclusive agent for the sale of Capital Fund stock at net asset value, plus a scale of sales charges payable to Moody's A & D. Approval of the merger by the Fund's stockholders would constitute approval of the new advisory contract between Capital Fund and Moody's A & D. Thus, as a result of the proposed transactions, the Fund would evolve into an open-end company which offered special investment services and engaged in continuous offering of its shares through the Moody's A & D distributor.

The aspect of the Lazard-D & B negotiations most important for our purposes, was an agreement dated April 5, 1967 between Lazard and D & B, which was to become effective upon the effective date of the merger if the advisory contract between Capital Fund and Moody's A & D were approved at that time. The proxy statement sent to stockholders of the Fund described this as follows:

Agreement between Dun & Bradstreet, Inc. and Lazard Freres & Co.

Dun & Bradstreet, Inc. of which Moody's Investors is a wholly-owned subsidiary has entered into an agreement with Lazard Freres & Co., investment adviser of the Corporation, to take effect upon the consummation of the merger, pursuant to which Lazard Freres & Co. has agreed for a period of five years from the effectiveness of the merger not (a) to become associated, either in a management or advisory capacity, with another investment company subject to registration under the Investment Company Act of 1940; (b) to permit the use of the name "Lazard", or any combination including such name, by any such investment company or investment company manager or adviser; and (c) to act as principal distributor for any open-end investment company making a continuous offering of its shares, and

2. One change clearly beneficial to the Fund's holders was the proposed elimina-

tion of the redemption charge of 1% of net asset value.

which is subject to registration under the Investment Company Act of 1940.

Lazard Freres & Co. has also agreed for a period of five years from the effectiveness of the merger unless otherwise specified (a) to make available Mr. Hettinger (or others) for the purpose of (1) reviewing and advising with respect to European economic and monetary conditions and (2) serving as a director of Moody's Capital Fund and/or Moody's Fund, Inc.; (b) to consult for a transitional period not in excess of one year with respect to the administrative operations of Moody's Capital Fund; (c) to use its best efforts to induce certain persons presently performing services for the Corporation to similarly perform for Moody's Capital Fund; and (d) to make available certain research reports and analyses prepared by them during the existence of the Corporation.

As consideration for such agreements, Dun & Bradstreet, Inc. will deliver to Lazard Freres & Co. 75,000 shares of its common stock, par value $1 per share. The 75,000 shares will be placed in escrow by Lazard Freres & Co. to secure performance of its obligations set forth in the first paragraph of this subsection and, subject to such performance, will be released at the rate of 10,000 shares annually for the next four years with the remaining 35,000 shares to be released at the end of the fifth year. Cash dividends will not be paid on such shares as from time to time remain unreleased from escrow, but such shares may be voted by Lazard Freres & Co. while they are subject to the escrow.

Plaintiffs allege, and defendants do not dispute, that D & B stock was selling over the counter at more than $37 per share at the time the contract was signed, although it had been selling at a lower price earlier during the negotiating period.[3]

On April 6, 1967, the Fund sent to stockholders a letter, a notice of special meeting of stockholders, a proxy and a proxy statement. The notice stated the chief business of the meeting to be approval of the merger of the Fund with Moody's Capital Fund and consequent adoption of the advisory contract between Capital Fund and Moody's A & D. While the stockholders were told of the agreement between Lazard and D & B in the manner already set forth, they were not asked to approve it. The letter, signed by Mr. Hettinger, a partner of Lazard and president of the Fund, informed the stockholders that the Fund's board of directors[4] recommended approval of the merger largely because it would cure the disadvantages which the Fund suffered by not engaging in continuous offering of its shares and by not making available special investment services. The proxy statement also recited that Lazard held of record 2,066,310 shares, constituting some 39% of the capital stock of the Fund, although none of these were owned beneficially.

3. The stock issuable to Lazard would not have commanded its full free trading price, both because of the dividend restriction stated in the last sentence of the quoted material, and because Lazard represented it was acquiring the stock for its own account and not with a view to resale or other distribution, except for Lazard's right, during certain periods, to require D & B to file a registration statement permitting such sale. In some instances this was to be at D & B's expense, in others at Lazard's. D & B also made, subject to certain qualifications, the usual "piggy-back" agreement to include the shares issuable to Lazard in any registration statement it might file of its own volition.

4. The Fund had eight directors. Two of them were Lazard partners; another was a senior partner in Lazard's counsel; all had been selected by Lazard. The meeting at which the merger was approved was attended by only five directors, including the three listed above. An outside director telephoned his approval during the meeting and still another had cabled his approval. The two Lazard partners abstained from voting.

Plaintiff Rosenfeld brought actions in the federal and state courts[5] on April 11 and 12, 1967, for an injunction and an accounting, alleging that the transactions involved a sale of its advisory office by Lazard. On April 14, Mr. Hettinger sent the Fund's stockholders a letter, the relevant portion of which is reproduced in the margin.[6] Later, other similar actions were brought in state and federal courts.

A motion to enjoin the merger was made in one of the state court actions but was withdrawn before the return day. At the meeting 4,269,346 shares were voted in favor of the merger, and only 38,545 against it. The transactions were thereupon consummated. The state actions were discontinued without prejudice, after a considerable number of motions unnecessary to recount, and defendants moved for summary judgment in the federal suits. That was granted, 319 F.Supp. 891 (1970), and this appeal followed.

Plaintiffs' case was predicated on a contention that the 75,000 shares of D & B ultimately deliverable to Lazard were not in fact issued solely in consideration of the four undertakings summarized in the quotation from the Proxy Statement but in large part for Lazard's assistance

---

5. We unreservedly condemn this practice which, for reasons that are well understood, is so frequently utilized in stockholder actions in the Southern District of New York with respect to investment companies and in many other stockholder suits. A litigant is entitled to his day in one court, but not in two—a consideration of special moment in these times of serious delays in trials. The record shows that a substantial burden was here placed on the New York courts, to no effect whatever. Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L. Ed. 226 (1922), prohibits a federal court from enjoining the state proceeding but not from staying its own. Cf. Klein v. Walston & Co., Inc., 432 F.2d 936 (2 Cir. 1970). District judges should feel free to make use of their power to stay the federal action unless the state action is discontinued, when no good reason for simultaneous maintenance of the state suit can be shown. We would hope state judges would feel similarly free to take appropriate action to avoid this sort of imposition.

6. "A stockholder of The Lazard Fund, Inc. brought suits on April 11 and 12, 1967 in the United States District Court for the Southern District of New York and the New York Supreme Court, allegedly on behalf of the Fund, to enjoin the voting of Fund shares in favor of the proposed merger of the Fund into Moody's Capital Fund, Inc. and the related matters described in the notice of special meeting, to enjoin the delivery or transfer of the 75,000 shares of common stock of Dun & Bradstreet, Inc. in accordance with the agreement between Dun & Bradstreet and Lazard Freres & Co. described in the proxy statement and for judgment requiring the defendants to account to the Fund for the defendants' profits and the Fund's losses. The defendants named are directors of the Fund, Dun & Bradstreet, Inc., Moody's Investors Service, Inc., Moody's Advisors & Distributors, Inc., Moody's Capital Fund, Inc. and Lazard Freres & Co. Both complaints allege among other things that Lazard Freres dominates and controls the Fund and its board of directors, that the agreements described in the proxy statement would constitute a sale by Lazard Freres of its investment advisory contract with the Fund and a sale by defendants of their fiduciary offices, that the transactions described in the proxy statement would deprive the stockholders of the Fund of their freedom to select directors, investment advisers and auditors and that the transactions described in the proxy statement are unlawful and would constitute gross abuse of trust. It is expected that the defendants will in due course serve answers denying liability and asserting that the proposed merger is in the best interest of the Fund and its shareholders. Since it is the opinion of the Fund's counsel that the plaintiff is not entitled to the injunctive relief demanded in the complaint, the matters specified in the notice of special meeting will be submitted as scheduled to the stockholders of the Fund on May 5, 1967.

"Neither the Lazard Fund, Inc. nor Moody's Capital Fund, Inc. will bear any expense for legal fees or out-of-pocket disbursements arising out of its being a party to the above litigation.

"An additional form of Proxy has been enclosed for your convenience in case you have not already voted or wish to change your vote with respect to the proposed merger."

in bringing about the merger and the consequent appointment of Moody's A & D as investment adviser, with the profits anticipated therefrom. Defendants argued that plaintiffs had failed to adduce sufficient evidence on this to resist their motion for summary judgment. While regarding plaintiffs' contrary position as "so extremely thin, in the face of solid proof sustaining defendants' position, that upon a trial we would probably be forced to set aside a verdict in plaintiffs' favor," [7] the judge did not place his decision on that ground. Rather, referring to the provision of § 15(a) of the Investment Company Act whereby any assignment of an advisory contract automatically terminates it, he held that "[W]here (as here) a majority of the stockholders approve a new advisory contract, as they are empowered to do by 15 U.S.C. § 80a–15(a), the management's conduct in arranging such a substitution does not violate the Act, regardless how it is labeled." In so holding the judge relied heavily on SEC v. Insurance Securities, Inc., 254 F.2d 642 (9 Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958), for the proposition that "the evil toward which the Act is directed is the transfer of control without consent of the shareholders * * * not the money received by the assignors of service contracts."

## II.

■ We start from one of the "well-established principles of equity," recognized in *Insurance Securities* itself, *supra,* 254 F.2d at 650, "that a personal trustee, corporate officer or director, or other person standing in a fiduciary relationship with another, may not sell or transfer such office for personal gain." There are ample authorities to support this proposition: Sugden v. Crossland,

3 Sm. & Giff 192, 65 Eng.Rep. 620 (1856) [trustee]; Gaskell v. Chambers, 26 Beav. 360, 53 Eng.Rep. 937 (1858) [corporate directors receiving compensation for loss of their office from transferee of the business]; McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899) [president of corporation receiving compensation for causing appointment of new directors]; Porter v. Healy, 244 Pa. 427, 91 A. 428 (1914) [directors]; Snyder v. Epstein, 290 F.Supp. 652 (E.D.Wis. 1968) [directors]; Kratzer v. Day, 12 F.2d 724 (9 Cir. 1926) [director's use of influence to secure control of the corporation for a third party]; see also Essex Universal Corp. v. Yates, 305 F.2d 572, 575 (2 Cir. 1962) (opinion of Lumbard, J.); In re Caplan, 20 A.D.2d 301, 246 N.Y.S.2d 913 (1st Dept.), aff'd, 14 N.Y. 2d 679, 249 N.Y.S.2d 877, 198 N.E.2d 908 (1964). The reason for the rule is plain. A fiduciary endeavoring to influence the selection of a successor must do so with an eye single to the best interests of the beneficiaries. Experience has taught that, no matter how high-minded a particular fiduciary may be, the only certain way to insure full compliance with that duty is to eliminate any possibility of personal gain.

■ Postponing the question of the effect of specific provisions of the Investment Company Act, we see no reason to doubt that, on the facts of this case, Lazard in its position as investment adviser came within the scope of this principle. In describing the far less intimate role of the publisher of an investment advisory bulletin, the Supreme Court quoted with approval Professor Loss' reference to "the delicate fiduciary nature of an investment advisory relationship." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 191, 84 S.Ct. 275, 283, 11 L.Ed.2d 237 (1963), citing 2 Loss, Se-

---

7. We do not share the judge's views on this point. Whether the consideration be valued at a price representing its worth to D & B or its lower value to Lazard, see fn. 3, a trier of the facts could readily find that the value of the covenants in the second paragraph of the material quoted from the proxy statement would

not have come anywhere near the lower figure, and that the importance of the non-compete agreement was questionable under the circumstances. The weight that should be given to these agreements in determining how much of the consideration would be subject to restitution is another matter.

curities Regulation 1412 (2d ed. 1961). Lazard could hardly deny the existence of a fiduciary relationship if stockholders of the Fund had alleged, for example, that the firm had taken for its own account an opportunity that should have been made available to the Fund, even though § 17(e) does not specifically prohibit this. While "to say that a man is a fiduciary only begins analysis," SEC v. Chenery Corp., 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943) (Frankfurter, J.), we would see no reason why the "well-established principle of equity" forbidding realization of profit for effecting the turn-over of corporate or other fiduciary office should not apply to the investment adviser of a mutual fund. See Notes, Protecting the Interests of Mutual-Fund Investors in Sales of Management-Corporation Control, 68 Yale L.J. 113, 121–28 (1958); 63 Colum.L.Rev. 153, 154–55 (1963). Lazard's influence with the Fund's stockholders can scarcely be questioned. Lazard had organized the Fund, and people had bought shares in it because of their trust and confidence in Lazard. All the Fund's personnel were furnished by Lazard. Unless the pattern differed from that of the industry, Lazard effectively managed the Fund's investments, despite the ultimate authority of the directors, quite as a trustee would do.[8] If Lazard did not wish to continue as adviser and chose to recommend a successor and assist in the latter's installation, it was obliged to forego personal gain from the change of office, no matter how deeply or rightly it was convinced it had made the best possible choice.[9] It is wholly immaterial that the prospect of receiving future management fees if it had continued as an adviser would have been an asset of Lazard rather than of the Fund; the same would be true of a trustee's right to receive future commissions or a corporate president's right to receive future salary and other benefits. Even ratification by the beneficiaries would not save a fiduciary from accountability for any amounts realized in dictating or influencing the choice of a successor unless this was secured with notice that the beneficiaries were entitled to the profit if they wished, cf. United Hotels Co. of America v. Mealey, 147 F.2d 816, 819 (2 Cir. 1945), and it is questionable whether even such ratification by a majority of the beneficiaries could bind others or the Fund itself. Quite apart from the question hereafter discussed whether the proxy statement was misleading as to the terms of the Lazard-D & B agreement, it is clear in any event that the Fund's stockholders were never asked to—and did not—ratify it.

It is understandable that, under "the morals of the marketplace," Lazard should see no reason why, having selected a competent adviser willing to serve on the same terms Lazard had done, it should not receive what the new incumbent was willing to pay for the opportunity. But equity imposes a higher standard. It is fitting to repeat Chief

8. See Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth [hereafter "Investment Company Report"], H.R.Rep.No.2337, 89th Cong., 2d Sess., 46, 87 (1966).

9. While the moving affidavit seeks to make the Moody transaction appear as a once in a lifetime opportunity, it is plain that the Fund had many other choices. It could have merged with a fund already being operated and engaging in continuous sales, possibly one whose advisory contract provided for a lower management fee. It could also have hired another adviser, perhaps on better terms, or performed its own management, very likely at less cost, see Investment Company Report Table III–5, p. 103. It might have become closed-end to avoid further shrinkage. The $4 billion of assets already being managed by Moody's Investors Service could be regarded as a detriment rather than an advantage. See Investment Company Report 261–62. There might also be concern lest D & B's issuance to Lazard of stock having a market value of some $3,000,000 might have a negative influence on any future negotiations to reduce the management fee. Even if an independent examination would reject all such possibilities in favor of the Moody merger, the prophylactic rationale behind the prohibition of fiduciary profit in this situation would remain.

Judge Cardozo's familiar words, "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties * * *. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

### III.

It is argued that, however all this might otherwise be, a different result is demanded because Lazard's advisory contract necessarily terminated under § 15 (a) (4) of the Investment Company Act and that, pursuant to § 15(a), the stockholders of the Fund authorized a new contract with Moody's A & D, allegedly on full disclosure, an issue we will discuss below.

■ Insofar as the argument hinges merely on the statutory nonassignability of the contract with the consequent inference that there was no advisory office that Lazard could sell or transfer, it proves too much. The same could be said of an alleged sale of corporate office or directorship or, in the absence of appropriate provisions in the dispositive instrument, of an executor's or trustee's position.[10] The role of Lazard, an organizer of the Fund and its practical control of the proxy machinery used to recommend the approval of Moody's A & D as new adviser, made it quite as active and influential as a corporate president who recommends a successor to his board of directors, or a trustee who puts the name of a successor before a judge. Indeed, the very fact of nonassignability demonstrates that any payment made to the outgoing adviser by his successor in these circumstances over and above the value of any continuing services represents consideration not for lawful assignment of the contract—which is prohibited—but primarily for the use of influence in securing stockholder approval of the successor who expects to profit from the post. While it is true that the advisory contract is not conceptually an asset of the Fund, it is equally true that the expectation of profits under that contract is not an asset which, under the Act, the adviser can assign outright. Hence, if plaintiffs are correct in asserting that Lazard's few covenants were only a minor part of the consideration for D & B's payment to Lazard, Lazard and D & B must have assumed that the outgoing adviser was in a position to help effect the transfer of his office and that his efforts in so doing were worth valuable consideration.

■ The more serious contention is that §§ 15(a), (c) and (d) constitute a policy determination by Congress that compliance with those provisions was to be the exclusive protection to an investment company when there is a change in advisory office. We cannot accept that view on the facts of this case. In § 1(b) of the Act, after noting abuses that had been disclosed with respect to investment companies, including the management of such companies in the interest of investment advisers and the transfer of control or management without the consent of the security holders, Congress declared:

> that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors.

The purpose of § 15 was to furnish the added protection of approval of a new adviser by a majority of the stockhold-

---

10. Indeed, Lazard's contract, being for personal services, could not have been assigned by it without at least the consent of the Fund's directors irrespective of § 15(a) (4). See Moulton v. Field, 179 F. 673, 675 (7 Cir. 1910), cert. denied sub nom. Bray v. Field, 219 U.S. 586, 31 S.Ct. 470, 55 L.Ed. 347 (1911); 3 Williston, Contracts § 421 (3d ed. 1960).

ers,[11] not to withdraw safeguards already afforded by equity. As has been said, "Section 15(a) (4) is directed at transfers of control without shareholder consent, as distinct from profiteering on a transfer of fiduciary office. Hence, the section on its face hardly compels the conclusion that it is the exclusive antidote for such conduct." See Note, 68 Yale L.J., *supra*, at 131.

That alone might suffice to require reversal here, since any argument that simple failure of § 15 to supplant the rule of equity leaves plaintiffs with only a state-created claim would be answered by the fact that their contentions with respect to the inadequacy of the proxy statement, hereafter considered, afford a sufficient basis for pendent federal jurisdiction. However, we do not rest decision on that ground. We believe rather that the statute not merely did not withdraw safeguards equity had previously provided but impliedly incorporated them. We held in Brown v. Bullock, 294 F.2d 415, 421 (2 Cir. 1961), that in requiring annual approval of investment advisory contracts by directors (or, alternatively, by stockholders) Congress meant to prescribe a uniform federal standard of directorial responsibility. It is wholly consistent with that view to say that when Congress required stockholder approval of a contract with a new investment adviser, it intended that the retiring adviser's use of the proxy machinery to procure appointment of the new adviser must conform to the standards of abnegation of personal gain that equity had long imposed. When Congress, in § 15(a), required shareholder approval of any new advisory contract, it must

have meant an approval uninfluenced by any improper motivations on the part of the outgoing adviser-fiduciary. If lured by the possibility of profit, the retiring adviser might recommend a successor who was less qualified or more expensive than other candidates, and who might be on the lookout for ways to recoup his "succession fee" at the expense of the Fund. See Note, *supra*, 68 Yale L.J. at 128. There is thus every reason for believing that Congress meant to adopt the established prophylactic rule. Just as it is unimaginable that, with respect to the responsibility of directors of investment companies, Congress would have been content "if a particular state of incorporation should be satisfied with lower standards of fiduciary responsibility for directors than those prevailing generally," see 294 F.2d at 421, it is similarly unthinkable that if a particular state had chosen not to recognize the rule of equity here in question Congress would have sanctioned an investment adviser's profiting from using his influence in securing stockholder approval of the appointment of a successor. Indeed, on defendants' view of the law, even disclosure would not be required in such a case, although they assert it was made here, since the profit acquired by the retiring adviser would not be material.

This brings us to the *Insurance Securities* case, *supra*, 254 F.2d 642. The SEC there unsuccessfully attacked a transaction whereby controlling stockholders of a service company which acted as sponsor, depositor, investment adviser and principal underwriter of an investment company sold their stock to a new controlling group at a price twenty-five

---

11. When, as here, a new adviser is appointed, it is clear that § 15(a) requires stockholder approval. Although question has been raised whether the alternative of approval "by a majority of the directors who are not parties to such contract or agreement or affiliated persons of any such party," § 15(c), is sufficient for "reinstatement" of a contract terminated by a change in control of the advisor, § 2(a) (4), see Note, Protecting the Interests of Mutual Fund Investors in Sales of Management-Corporation Control,

*supra*, 68 Yale L.J. 116 fn. 9 (1958), we think a negative answer to be rather clearly dictated. Congress has decreed that a change in control terminates the contract, so that the fund would be dealing with a new party in fact even though not in form. The policy behind § 15(a) would thus seem to require that the new contract be approved by the fund's shareholders. See Jennings & Marsh, Securities Regulation 1246 (2d ed. 1968).

times its net asset value, and the stockholders of the investment company then approved new contracts with the service company. The actual holding can be readily distinguished since the SEC was proceeding under § 36 of the Act. This authorized the Commission to bring suit for "gross misconduct or gross abuse of trust" and provided that if the court found the Commission's allegations to be established, it should enjoin the person found guilty from acting in its prior capacity either permanently or for such period as the court deemed appropriate. Words and remedies such as these were clearly addressed to highly reprehensible conduct, see Los Angeles Trust Deed & Mortgage Exchange v. SEC, 264 F.2d 199, 210 (9 Cir. 1959), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); we would not dream of suggesting, much less holding, that Lazard's actions were so culpable. However, there are passages in the opinion suggesting that in the court's view none of the excess of the price received by the controlling stockholders over the book value of their stock would be recoverable under any circumstances by stockholders of the investment company. Accord, Krieger v. Anderson, 40 Del.Ch. 363, 182 A.2d 907 (Del.Sup.Ct.1962). While we do not find it necessary at this time to determine whether the difference between a transaction such as that here before us and the sale of a controlling block in a corporate adviser at a price reflecting the expectation of profits under a renewed contract with the corporation which the sellers were to aid in procuring, is sufficiently substantial to warrant a different result in this latter case, we should not wish to be understood as accepting these views.[12-13]

---

12. Some difficulties in applying the principle prohibiting profit in the transfer of the advisory office to the sale of controlling stock in a corporate investment adviser are mentioned in Jaretzki, The Investment Company Act: Problems Relating to Investment Advisory Contracts, 45 Va.L.Rev. 1023, 1030–34 (1959). Since our decision does not rest on § 36 of the Act, as it then stood, many of these criticisms would be inapposite even if we were dealing with the sale of stock situation. Similarly, to the extent that our decision rests on a prophylactic rationale —removing the temptation for the outgoing adviser to use his influence to recommend a successor, one of whose qualifications is willingness to compensate the retiring adviser for his help—most of the author's other criticisms also miss the mark. The *Insurance Securities* decision is criticized in Note, Protecting the Interests of Mutual-Fund Investors in Sales of Management-Corporation Control, *supra*, 68 Yale L.J. at 121–33, which, however, argues that the amount of unjust enrichment may be less when the same adviser is expected to continue, *id.* at 130. Krieger v. Anderson, 40 Del. Ch. 363, 182 A.2d 907 (Del.Sup.Ct.1962), which followed *Insurance Securities*, is criticized in 63 Colum.L.Rev. 153 (1963).

13. Appellees also argue that stock, perhaps even controlling stock, in banks or trust companies administering trusts is frequently sold at a profit, without any known case in which this has been held recoverable by beneficiaries of trusts being administered. The sale of stock not constituting control is readily distinguishable. Payment of premiums for control stock has generally been considered by the cases and commentators as raising a problem with respect to the duty of the controlling stockholders to the minority, see Cary, Corporations: Cases and Materials 827–61 (4th ed. 1969), rather than in the context here considered. Usually, of course, commissions for acting as trustees or investment adviser will be only a fraction of the income of a bank or trust company, and the price realized for the control stock represents, in the main, an appraisal of the total. Furthermore, issuance or sale of a controlling block of stock in a bank or trust company acting as a trustee differs from the investment advisory context in important respects. A person who selects a bank or trust company as trustee must contemplate that a change in control of the corporate trustee may occur during the life of the trust. While trust instruments often confer advance sanction on mergers on the one hand, or provide an absolute right to terminate a trusteeship on the other, the settlor does not expect that he or the *cestuis* will have any voice in the timing or nature of a shift in control. There is thus no need to fear that the person who purchases the controlling interest will pay the seller for exerting his influence to have the purchase approved

## IV.

Appellees also rely on the history of the recent amendment to the Investment Company Act, 84 Stat. 1413 (1970). In the Investment Company Report, after stating that "[t]he manager of a mutual fund is unquestionably in a fiduciary relationship to it," and that "[c]onsequently, the transfer of that relationship for a price has some elements of the sale of a fiduciary office [which was] strictly prohibited at common law because of the conflicts of interest which are involved," the Report added that "certain of the protective provisions of the Act have had the somewhat ironical, and presumably unintended, effect of diluting the protections provided by common law principles of fiduciary responsibility." P. 151. The Report continued that "by reason of the automatic termination provisions in the event of assignment and the requirement that shareholders approve the new arrangements, it can be argued, as was successfully done in SEC v. Insurance Se-

curities, Inc., that there is no sale of the fiduciary office, since that office automatically terminates and a new one is created with stockholder approval." Pp. 151–52. It went on to say that "[h]owever unrealistic this conclusion may appear in the light of the ability of the retiring management to use the proxy machinery to insure the installation of its self-chosen successors, application of the strict common-law principle might well be unfair insofar as it denies to the retiring management any compensation for the elements of value in the relationship which they may have built up over the years" and "could also be harmful to the Fund, since existing management might be reluctant to surrender that relationship and to provide the Fund with new and possibly more effective management."[14] Arguing that "there is presently no adequate remedy in the Act" since the Commission "must rely primarily at present on its authority to seek an injunction under section 36 of the act

by the beneficiaries of the trusts. This contrasts with the provisions of the Act which specifically give a fund's shareholders a right to exercise their judgment in approving any new advisory contract. The prime vice in the realization of profit by an investment adviser or a controlling shareholder from a would-be successor lies in the danger that in return for this he may exert his influence to secure stockholder approval of the new or reinstated contract when that may not be the best possible course. It will be time to deal with the unlikely case where the adviser retires or the controlling stockholder sells his interest in the advisory company at a profit but scrupulously avoids any involvement with the required approval of the new contract, when it arises. Cf. McClure v. Law, 161 N.Y. 78, 81, 55 N.E. 388 (1899).

14. It is hard to accept the implication that it is solely up to the adviser to decide whether he will retire from that position in favor of a more effective manager. Section 15(a) (2) has long provided that an advisory contract must be approved annually by the fund's board of directors or stockholders, and § 15(a) (3) gives the fund's directors and stockholders the right to terminate the advisory contract without penalty upon sixty days' notice

to the adviser. While, in a practical sense, the fact that the adviser ordinarily dominates the fund and its directors lessens the value of these provisions, still the fund's directors are amenable to suit if they discharge their annual approval function in a merely perfunctory fashion. See Brown v. Bullock, *supra,* 294 F.2d at 420–421. And the 1970 amendment of § 15(c) makes more stringent the requirements of director approval. Annual advisory contract renewals now *must* receive approval of a majority of disinterested directors casting their votes in person at a meeting specially called for that purpose. Hence, the directors can no longer avoid responsibility for approving a disadvantageous advisory contract by leaving the approval to a majority of the outstanding shares. Moreover, the amended section enjoins upon the directors a duty "to request and evaluate * * * such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser." Hence, in a situation like that at bar, if Lazard was convinced that its unwillingness to engage in continuous sales was detrimental to the Fund, and the independent directors believed this, they would have an affirmative responsibility to seek out a successor.

upon the ground that, in arranging the succession, management or directors have been 'guilty' of 'gross misconduct or gross abuse of trust,' " a stigma which the courts "might be extremely reluctant" to place upon businessmen "merely because the terms of succession appear unfair," it urged Congress to amend the Act to prohibit a transfer of an advisory contract or the sale of a controlling block in an adviser, "if the sale, or any express or implied understanding in connection with the sale, is likely to impose additional burdens on the investment company or to limit its freedom of future action." P. 152. The bill enacted by Congress did not carry out this recommendation.

Appellees would have us draw two inferences from this episode. One is that the SEC has acceded to the view that the prohibition against receiving compensation for the sale of a fiduciary office is inapplicable to a situation where the retiring adviser of an investment company profits from influencing the designation of a successor. The passages we have quoted demonstrate that if there was any such acceptance, it was a reluctant one, believed, erroneously in our view, to be compelled by the Ninth Circuit's decision in *Insurance Securities.* That case, as we have pointed out, dealt only with the Commission's powers under § 36 as it then stood. The SEC's belief that the unamended Act did not adequately protect fund shareholders against sales of the management organization rested upon a realistic assessment of its own power under § 36 but what we deem an unjustifiably defeatist view of private equitable actions, which the Report apparently did not consider. Although we respect the SEC's interpretation of the

statutes it administers, the ultimate responsibility for construction lies with the courts.

The second and even more important inference we are asked to draw is that, by failing to adopt the SEC's proposal, Congress indicated an intention to exclude all remedies other than termination of the old contract and the need for stockholder approval of the new one, even if such approval was obtained by an adviser who was realizing a profit. We have been cited to nothing in the committee reports, in the floor debates, or even in the hearings that casts light on the failure to enact the proposal, or shows that the SEC seriously pressed it. As is well known, the SEC had other, and more important, fish to fry. Congress could well have thought it had handled the problem created by the *Insurance Securities* decision by expanding the SEC's powers under § 36 so that, instead of having to allege that a defendant had been "guilty * * * of gross misconduct or gross abuse or trust," the Commission need now allege only that he has engaged or is about to engage "in any act or practice constituting a breach of fiduciary duty involving personal misconduct." [15] While a new § 36(b) expressly declares that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment advisor," the context makes plain that Congress did not mean this to be the only fiduciary duty of investment advisers.

---

15. The amendment also changed the remedial provision so that instead of being limited to enjoining a person from acting in his former capacity, the court might "award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 1(b) of this title." Congress recognized that "The highly punitive overtones of the existing section, together with the injunctive penalty, seriously impairs the ability of the courts to deal flexibly and adequately with wrongdoing by certain affiliated persons of investment companies." S.Rep. No. 91–184, 91st Cong. 2d Sess., p. 36 (1970) printed in 3 U.S.Code Cong., & Adm. News 4931.

## V.

We come finally to appellants' contention that, regardless of the issues thus far discussed, they were entitled to relief because the portion of the proxy statement quoted above did not fairly summarize the agreement between Lazard and D & B.[16] Two somewhat related criticisms are made. The first is a claim that in truth and fact the 75,000 shares of D & B referred to in the third paragraph were not being delivered to Lazard solely "as consideration for" the agreements of Lazard listed in the two preceding paragraphs but rather were to be given, at least in part, for Lazard's influencing the Fund's stockholders to assent to the merger and the consequent employment of Moody's A & D as investment adviser. Contrary to the district court's assumption, we do not believe that nothing more was involved here than an alleged misstatement of Lazard's "true motive." Lazard's motive—obtaining 75,000 D & B shares—was never contested. The disputed issue is what consideration Lazard was furnishing for that stock, only the various covenants recited in the proxy statement or also the use of its influence in securing stockholder approval. For reasons already indicated in another context, see fn. 7, we believe appellants' contentions here raised a factual issue which should not have been determined on a motion for summary judgment.

The second criticism is that the reference to 75,000 D & B shares "par value $1 per share" not only gave the stockholders no conception of how much Lazard was obtaining but tended to mislead them. While sophisticated investors could have ascertained the price at which D & B was selling over-the-counter from the New York Times or the Wall Street Journal or, for that matter, by calling their brokers, many would not know, or think, of these possibilities. Moreover, although a lawyer or a sophisticated investor would realize the lack of signifi-

cance in a statement of $1 par value, which the Fund's shares themselves had, a court could find that not all shareholders would do so. Hence, despite the considerations mentioned in note 3, the failure to give the Fund's shareholders some notion that Lazard was obtaining a very substantial sum from D & B, as could so easily have been done, might well be considered to constitute an omission to state a material fact "necessary in order to make the statements therein not false or misleading," Rule 14a–9. Cf. Alleghany Corp. v. Kirby, 333 F.2d 327, 345–346 (2 Cir. 1964) (dissenting opinion), aff'd by equally divided court in banc, 340 F.2d 311 (2 Cir. 1965), cert. dismissed as improvidently granted, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966). Hafner v. Forest Laboratories, Inc., 345 F.2d 167 (2 Cir. 1965), does not compel a different result. In that case there was no fiduciary relation, nor had the defendant made any statement which was misleading in light of information withheld. There was simply a refusal to disclose; and the single plaintiff, an attorney, conceded that he knew where the market price could be ascertained. If summary judgment had not been granted here, the plaintiffs might have shown that in light of the character and distribution of the Fund's shareholders, the omission to give some indication of the true value of the D & B shares, after disclosing the nominal par value, was misleading. And we do not entertain the district court's substantial doubt as to the materiality of this information, for even though Lazard was receiving the payment from D & B, not from the Fund, the Fund's stockholders might have hesitated to approve the merger and advisory contract terms if they were told that D & B was willing to pay so large a sum to have the transactions consummated.

Lazard's argument that the Proxy Statement was made by the Fund and not by itself is unimpressive. All employees of the Fund were hired and paid for by Lazard, and discovery could well

---

16. If this argument is sound, it would also negate any contention with respect to shareholder approval.

show that the statement, or at least the summary of the Lazard-D & B agreement, was prepared by Lazard or persons for whose acts it is legally responsible. It would surely come as a surprise to discover that Lazard did not control the Fund's proxy machinery. Finally, if the proxy statement should be held to have been misleading, plaintiffs' remedies are not limited to injunctions or rescission but could include an accounting for profits wrongfully obtained. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386–389, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The devising of an appropriate remedy concerning this claim, as well as with respect to that earlier considered, if found to be warranted, is in the first instance for the district court.

The order granting defendants' motion for summary judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.