529 So.2d 1174 (1988)
Marjorie R. MARTIN, Individually, and Henry Spiegel, Anne Spiegel and the Diane Birdman Irrevocable Trust, As General Partners of Nottingham Associates, a Florida General Partnership, Individually, and As Representatives of All Similarly Situated Shareholders of City National Bank Corporation, Appellants,
v.
Robert M. MARLIN and Jack D. Burstein, Appellees.
No. 86-3163.
District Court of Appeal of Florida, Third District.
July 12, 1988.
Rehearing Denied September 7, 1988.
Kenny, Nachwalter & Seymour, and Thomas H. Seymour and Kevin J. Murray, Miami, for appellants.
Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, and Aaron S. Podhurst, Anderson, Moss, Russo & Cohen, Daniels and Hicks, and Mark Hicks, and Ralph O. Anderson and Elizabeth Koebel Clarke, Miami, for appellees.
Before HUBBART, BASKIN and DANIEL S. PEARSON, JJ.
*1175 DANIEL S. PEARSON, Judge.
The issue in this case is whether the defendants, Marlin and Burstein, breached any fiduciary duty to the plaintiffs, minority shareholders in the City National Bank Corporation, or unlawfully sold their positions as corporate officers when they accepted a substantial premium for the sale of their shares of stock and rights to vote certain other stock, and thereby relinquished their voting control in the corporation. We hold that the actions of the defendants were lawful and that, therefore, no cognizable cause of action was asserted by the plaintiffs. We accordingly affirm the summary judgment for Marlin and Burstein.

I.

A.
In 1981, City National Bank Corporation was a thinly-traded corporation with about 215 shareholders owning the 2,072,720 shares issued by the bank.[1] Slightly more than 42 percent of the corporation's stock  857,087 shares  was held in the City Voting Trust. In February of that year, Marlin and Burstein gained control of the bank through ownership and control of shares in the City Voting Trust, and the voting rights to 200,000 shares of stock outside the trust under a proxy/option agreement with the owner of the shares, Polly Lux de Hirsch Meyer.[2] Marlin assumed the chairmanship of the bank, and Burstein became a member of its board of directors and its president.

B.
Alberto Duque  eventually to purchase Marlin and Burstein's controlling interest in the bank, the event which precipitated this lawsuit  made his first substantial investment in the bank when, in early 1981, he bought 327,908 shares  38 percent  of the City Voting Trust.[3] Although Duque became a trustee along with Marlin and Burstein, management decisions of the Trust were required to be made by two of the three trustees. Thus, the voting unit of Marlin and Burstein, through their own shares and control of others, effectively controlled all of the shares held in the City Voting Trust.
Several weeks later, Duque received from Marlin and Burstein a 37.5 percent interest in their proxy/option agreement with de Hirsch Meyer. In June 1981, in an attempt to enhance his emerging effort to take control of the bank, Duque purchased 767,500 shares not held in the Voting Trust  37 percent of the outstanding shares of the bank. Thus, after June 1981, Duque owned a total of 1,095,408 shares  327,908 in the Voting Trust and 767,500 outside the Voting Trust  or more than fifty percent of the total number of shares issued by the bank. But despite his ownership of a majority of the bank's outstanding shares, Duque did not control the bank because he did not control the Voting Trust.
In August 1981, Duque, unsuccessful in enlisting the cooperation of other shareholders in his attempt to gain control of the Voting Trust and unsuccessful in his efforts to persuade Marlin and Burstein to buy him out, agreed to purchase the shares held in the Voting Trust by Marlin and Burstein and others, at $45.00 per share, a premium of $33.00 per share above the then-existing market value. Duque also agreed to pay Marlin and Burstein $4,590,000 for their interest in the de Hirsch Meyer proxy/option agreement[4] and to indemnify *1176 Marlin and Burstein for any claims that might be asserted by the remaining shareholders, those holding shares outside the Voting Trust.
The actual sale was delayed six months for tax reasons. During this period, Marlin and Burstein did nothing to inform the minority shareholders of the agreement and ignored objections raised by the few who learned of it. When the sale took place, Burstein, as president of the bank, caused the bank to issue a general release to himself, Marlin, and the other members of the Voting Trust. Upon the sale, Duque finally gained control of the bank; he owned 1,624,587 shares (all 857,087 shares in the Voting Trust and 767,500 shares outside the Trust) and controlled the vote of the 200,000 shares in the proxy/option agreement. Marlin and Burstein resigned their positions as directors and Burstein his as president; Duque assumed control.

C.
The plaintiffs are shareholders whose shares were not held in the Voting Trust and were not bought by Duque. Although they make no claim that the value of their shares diminished as a result of the sale of others' stock to Duque  indeed the plaintiffs' subsequent sales of their stock at a substantial profit show otherwise  they want to share in the good fortune of Marlin and Burstein (and other Voting Trust shareholders) which they allege came about because Marlin and Burstein (1) improperly used their fiduciary positions to further their own interests; (2) sold their corporate offices; (3) unfairly favored the minority shareholders in the Voting Trust when they required that Duque pay a premium for their shares, but not those of minority shareholders who were not members of the Trust; (4) breached their fiduciary duty when they required Duque to purchase the shares in the proxy/option agreement, even though Duque did not need the shares to gain control of the Bank; and (5) engaged in a civil conspiracy against the plaintiffs. The essence of all but the last of these allegations is that Marlin and Burstein unfairly retained the premium they received for their controlling interest in the corporation; thus, we treat them as one.

II.
The law of the marketplace dictates that a shareholder who has a controlling interest in a corporation will likely be able to receive a higher price per share than a minority shareholder. As a general rule, nothing in the law of the courthouse prevents a majority shareholder from retaining this "control premium." See Delano v. Kitch, 663 F.2d 990, 998 (10th Cir.1981); Zetlin v. Hanson Holdings, Inc., 48 N.Y.2d 684, 421 N.Y.S.2d 877, 397 N.E.2d 387 (1979); H. Henn & J. Alexander, Laws of Corporations and Other Business Enterprises § 241, at 657 (3d ed. 1983). This is so even if, as is so frequently the case, the controlling shareholder is an officer or director of the corporation. E. Brodsky & M.P. Adamski, Law of Corporate Officers and Directors § 5:01, at 5-2 (1984). While some decades ago this general rule was under persistent attack in academia, it is clear that the rule survived unscathed in the courts and, indeed, now finds itself in fashion in a significant segment of academia.[5] This debate aside, courts have generally held firm to the rule:
"The thoughtful and scholarly writings of the academic commentators on sale of *1177 control have had surprisingly little influence on the way courts decide cases. With only infrequent and relatively minor exceptions, the courts still adhere to the traditional view that a shareholder, irrespective of whether he is also a director, officer, or both, may sell his shares, just as he may sell other kinds of personal property, for whatever price he can obtain, even if his shares constitute a controlling block and the price per share is enhanced by that fact. Further, the courts generally hold that neither the selling shareholder nor his purchaser is under an obligation to see that other shareholders are provided opportunities to sell their shares on the same favorable terms as the controlling shareholder or even to inform minority shareholders of the price and other terms of the sale of the controlling interest."
O'Neal, Symposium: Sale of Control  Introduction, 4 J. Corp. L. 239, 239 (1979).
Undaunted by the weight of this authority, the plaintiffs rely on the oft-quoted words of Judge Friendly:
"We start from one of the `well-established principles of equity ... that a ... corporate officer or director ... may not sell or transfer such office for personal gain.' ... The reason for the rule is plain. A fiduciary endeavoring to influence the selection of a successor must do so with an eye single to the best interests of the beneficiaries. Experience has taught that, no matter how high-minded a particular fiduciary duty may be, the only certain way to insure full compliance with that duty is to eliminate any possibility of personal gain."
Rosenfeld v. Black, 445 F.2d 1337, 1342 (2d Cir.1971).[6] What the plaintiffs overlook is that this well-established principle of equity that a corporate officer or director may not sell such office for personal gain is limited to situations where the sale of the corporate office is "by itself (i.e., unaccompanied by sufficient stock to carry voting control)," M. Feuer, Personal Liabilities of Corporate Officers and Directors, 103 (J. Johnston rev. 2d ed. 1974) (emphasis supplied). See In re Caplan, 20 A.D.2d 301, 303, 246 N.Y.S.2d 913, 915 (App.Div.) ("Where there has been a transfer of the majority of the stock, or even such a percentage as gives working control, a change of directors by resignation and filling of vacancies is proper."), aff'd, 14 N.Y.2d 679, 249 N.Y.S.2d 877, 198 N.E.2d 908 (1964); San Remo Copper Mining Co. v. Moneuse, 149 A.D. 26, 133 N.Y.S. 509 (App.Div. 1912); H. Henn & J. Alexander, Laws of Corporations and Other Business Enterprises § 241, at 656 n. 1 (3d ed. 1983) ("Generally, it is illegal to sell corporate office or management control by itself, that is, accompanied by no transfer of shares or insufficient shares to carry voting control."); E. Brodsky & M.P. Adamski, Law of Corporate Officers and Directors § 5:06, at 5-15 (1984) ("[T]he promise to secure the election of a majority of the purchaser's representatives to the board of directors may be invalid unless accompanied by the sale of sufficient shares to constitute control."); 1 F.H. O'Neal & R. Thompson, O'Neal's Oppression of Minority Shareholders § 4:02, at 4-5, 4-6 (2d ed. 1985) ("[T]he seller of a controlling interest ... may, in connection *1178 with the sale of his interest, procure the resignation of incumbent directors or officers and their replacement with the purchaser's nominees."). Cf. 18B Am.Jur. Corporations § 1805, at 658 (1985) ("A transaction in which directors or officers who own a majority of the stock of a corporation sell the stock and agree to, or resign so as to facilitate, the taking over of control by the purchasers may be legal, but such a transaction will be closely scrutinized for fraud."). Indeed, as Judge Friendly himself earlier observed, a contractual provision which would require as a condition of the sale that the seller of stock deliver to the buyer the resignations of the majority of the company's directors and cause the buyer's nominees to be elected in their place is violative of public policy "save when it was entirely plain that a new election would be a mere formality  i.e., when the seller owned more than 50% of the stock." Essex Universal Corp. v. Yates, 305 F.2d 572, 581 (2d Cir.1962) (Friendly, J., concurring). Because in the present case the resignations of Marlin and Burstein, being accompanied by their transfer of a controlling interest of the corporation to Duque, made the resignations and the new elections a mere formality, no unlawful sale of corporate office or breach of fiduciary duty occurred.[7]
The plaintiffs' claim that Marlin and Burstein breached their fiduciary duty  or sold *1179 their corporate offices  when they required Duque to purchase the voting rights to the shares in the de Hirsch Meyer proxy/option agreement is based on the erroneous proposition that this agreement is separate from Duque's simultaneous agreement to purchase the outstanding shares of the Voting Trust. While it is true that control of the Voting Trust when added to his existing shares was enough to give Duque control of the corporation, the additional premium that Marlin and Burstein required before they would surrender control of the Voting Trust was Duque's purchase of the voting rights to the 200,000 shares for $4,590,000.
Likewise, we reject the plaintiffs' claim that Marlin and Burstein unfairly favored the minority shareholders in the Voting Trust when they required that Duque pay a premium for their shares, but not those of minority shareholders who were not members of the Trust. This claim fares no better than the plaintiffs' claim that Marlin and Burstein unfairly favored themselves. If there is no duty to share one's own profit, there is no duty to share one's friends' profits. See Clagett v. Hutchison, 583 F.2d 1259 (4th Cir.1978); Haberman v. Murchison, 331 F. Supp. 180, on reargument, 335 F. Supp. 286 (S.D.N.Y. 1971), aff'd, 468 F.2d 1305 (2d Cir.1972). But see Ferraioli v. Cantor, 281 F. Supp. 354 (S.D.N.Y. 1967).

III.
Lastly, we conclude that the plaintiffs state no claim for relief under the rubric of conspiracy. While Florida courts have under certain circumstances recognized a cause of action called the "independent tort of conspiracy," that is, a conspiracy unaccompanied by an underlying tort, see, e.g., Churruca v. Miami Jai Alai, Inc., 353 So.2d 547 (Fla. 1977); Snipes v. West Flagler Kennel Club, Inc., 105 So.2d 164 (Fla. 1958); Liappas v. Augoustis, 47 So.2d 582 (Fla. 1950); American Diversified Insurance Services, Inc. v. Union Fidelity Life Insurance Co., 439 So.2d 904 (Fla. 2d DCA 1983); Buckner v. Lower Florida Keys Hospital District, 403 So.2d 1025 (Fla. 3d DCA 1981); Margolin v. Morton F. Plant Hospital Association, Inc., 342 So.2d 1090 (Fla. 2d DCA 1977); Regan v. Davis, 97 So.2d 324 (Fla. 2d DCA 1957); see generally Franklin Music Co. v. American Broadcasting Co., 616 F.2d 528 (3d Cir.1980) (Sloviter, J., concurring), the essence of the tort is that the defendants be possessed of "some peculiar power of coercion ... by virtue of their combination, which power an individual would not possess." Churruca v. Miami Jai-Alai, 353 So.2d at 550. When the concerted acts of the defendants do not create a greater harm than if the acts were committed by one person alone, then there can be no recovery. See Franklin Music Co. v. American Broadcasting Co., 616 F.2d at 551 (Sloviter, J., concurring) ("The rationale for such a tort is that the combination itself provides the additional power to oppress individuals, `since there is a power in numbers, when acting in concert, to inflict injury, which does not reside in persons acting separately.'"); DesLauries v. Shea, 300 Mass. 30, 33-34, 13 N.E.2d 932, 935 (1938) ("The evidence in this case shows no peculiar power of coercion possessed by the defendants in combination which would not ordinarily have been possessed by mortgagees and purchasers at foreclosure sales."); Liappas v. Augoustis, 47 So.2d at 583 ("While the combined actions of two or more persons might exert more pressure on the person affected, the nature of the individual act is not altered, nor its character affected or changed, by the combination. It is our opinion, therefore, that a civil action for conspiracy to commit such acts cannot be maintained in this state."). Thus, in the present case, because an individual possessed of the shares and voting rights which Marlin and Burstein possessed could have sold a controlling interest in the corporation for a premium without the aid and cooperation of anyone else, the peculiar power of coercion necessary to establish the independent tort of conspiracy is not present.
Affirmed.
NOTES
[1] City National Bank Corporation owned almost all the shares of City National Bank, and for purposes of this appeal, the two entities will be treated interchangeably, sometimes referred to as the corporation and sometimes as the bank.
[2] The agreement gave Marlin and Burstein the voting rights to the 200,000 shares owned by de Hirsch Meyer in return for Marlin and Burstein's promise to purchase the shares from de Hirsch Meyer at a predetermined price, if she chose to sell.
[3] Differences as to the exact number of shares purchased, dollars paid, or percentages of shares exchanged have been resolved in favor of the plaintiffs for purposes of this appeal. As will be seen, these differences are immaterial to the resolution of the issues on this appeal.
[4] The sole consideration given by Marlin and Burstein for their interest in the proxy/option was their substantial undertaking to purchase the shares from de Hirsch Meyer at a predetermined above-market price.
[5] Perhaps the most prominent critic of the traditional rule was Professor Adolph Berle, who overconfidently wrote of "a slowly emerging rule (by no means universally acknowledged) that, where stockholdings carrying controls are sold, any identifiable portion of the consideration paid for the power-position over and above the value of the stock ex the control-power element belongs not to the control-seller but to the corporation or (perhaps) to all the shareholders ratably." Berle, "Control" in Corporate Law, 58 Colum.L.Rev. 1212, 1220 (1958) (footnote omitted). See generally Hamilton, Private Sale of Control Transaction: Where We Stand Today, 29 Corp.Prac.Comm. 3, 5 (1987) ("[M]ost academic commentary on the sale of control issue  including that of many of the most respected academic writers in the corporations law field between 1930 and 1970  has been critical of it.") (originally published in 36 Case W.Res.L. Rev. 248 (1986)). More recently, however, the so-called Chicago School of legal economics has given the "long settled" general rule substantial academic support. Hamilton, supra, at 5. This school argues that the economy is best served by allowing control premiums to be retained by sellers: "Any attempt to require sharing simply reduces the likelihood that there will be gains to share." Easterbrook & Fischel, Corporate Control Transactions, 91 Yale L.J. 698, 698 (1982). It continues:

"The sale of a control bloc of stock, for example, allows the buyer to install his own management team, producing the same gains available from a tender offer for a majority of shares but at lower cost to the buyer. Because such a buyer believes he can manage the assets of a firm more profitably, he is willing to pay a premium over the market price to acquire control. The premium will be some percentage of the anticipated increase in value once the transfer of control is effectuated. If there were no anticipated increase in value, it would be irrational for the buyer to pay the premium. There is a strong presumption, therefore, that free transferability of corporate control, like any other type of voluntary exchange, moves assets to higher valued uses."
Id. at 705.
[6] But see Easterbrook & Fischel, Corporate Control Transactions, 91 Yale L.J. 698, 722 (1982) ("Judge Friendly's sweeping declaration about the lessons of hard experience has more confidence than confirmation behind it.").
[7] The plaintiffs rely upon several cases which, they urge, hold that control premiums must be shared with minority shareholders or the corporation itself. In our view, these cases do not necessarily conflict with our holding today that officers and directors may retain control premiums when they relinquish their controlling interest in the corporation along with their offices. We read Rosenfeld v. Black, 445 F.2d 1337 (2d Cir.1971), as involving the relinquishment of the office of investment advisor to the corporation in exchange for the purchase of the investment advisor's stock, unaccompanied by a transfer of a controlling interest in the corporation. Nothing in Rosenfeld, also authored by Judge Friendly, indicates a departure from the views Judge Friendly expressed in Essex Universal Corp. v. Yates, 305 F.2d 572. More telling, however, is that only four months after Rosenfeld was decided, the Second Circuit in Haberman v. Murchison, 468 F.2d 1305, 1314 & n. 6 (2d Cir.1972), said that it was "fairly well established and generally accepted" that "it is illegal to (1) sell a corporate office, or (2) sell management control of the corporation without also selling a controlling block of the voting stock," citing as authority Essex without any mention of Rosenfeld.

Brown v. Halbert, 271 Cal. App.2d 252, 76 Cal. Rptr. 781 (1969), is distinguishable because of the assorted egregious and coercive tactics perpetrated by the sellers of control against the minority shareholder which, significantly, caused the minority stock to be devaluated. While the plaintiffs urge that it is irrelevant whether they lost money or, as here, simply failed to realize a profit equal to that realized by Marlin and Burstein, the fact that there has been no loss to the minority shareholders has been considered relevant to their right to recover. Benson v. Braun, 8 Misc.2d 67, 155 N.Y.S.2d 622 (Sup.Ct. 1956). See also Easterbrook & Fischel, Corporate Control Transactions, 91 Yale L.J. 698, 698 (1982) ("[T]hose who produce a gain should be allowed to keep it, subject to the constraint that other parties to the transaction be at least as well off as before the transaction.").
Forinash v. Daugherty, 697 S.W.2d 294 (Mo. Ct. App. 1985), shares with Brown v. Halbert the distinguishing fact that the minority shareholders suffered an actual loss; "[s]uch market as there had been for the shares representing their investment was practically destroyed." Forinash v. Daugherty, 697 S.W.2d at 305. Moreover, the Forinash court treated the bank as if it were a closely-held corporation: "[t]he merits of this case are controlled by the law of corporations, particularly those described as `close' or `closely-held' corporations." Id. at 299. See also Grogan v. Garner, 806 F.2d 829, 835 (8th Cir.1986) ("The primary issue in [Forinash] was whether Missouri holds controlling shareholders in a closely held corporation to a fiduciary duty to minority shareholders... ."). This is significant because "it has been considered that the officers, directors and controlling shareholders of a `close' corporation owe a higher degree of fiduciary duty to minority shareholders than do their counterparts in public corporations." Forinash v. Daugherty, 697 S.W.2d at 302-03. Cf. H. Henn & J. Alexander, Laws of Corporations and Other Business Enterprises § 240, at 655 (3d ed. 1983) ("In closely-held corporations, some fiduciary duties among the shareholders, possibly analogous to those among partners, have been recognized."). There is no contention in the present case that City National Bank Corporation should be treated as a closely-held corporation or that Marlin and Burstein should be held to some higher standard than the fiduciary of a public corporation.
While these distinctions exist, the fact remains that Forinash, and perhaps Brown, insofar as they provide relief to minority shareholders despite the majority's concomitant sale of control, stand virtually alone in vague defiance of the well-accepted rule that no relief is available.