LESTER KRIEGER, Plaintiff-below,
Appellant,

*vs.*

THOMAS D. ANDERSON, THEODORE E. SWIGART, ERNEST T. SKINNER, W. T. CARTER, III, GEORGE R. BRYANT, DILLON ANDERSON, JOHN M. BENNETT, JR., JOHN H. BLAFFER, RORICK CRAVENS, ROBERT K. HUTCHINGS, J. W. LINK, JR., CHARLES A. PERLIZT, JR., LAWRENCE S. REED, EDWARD ROTAN, FRANK STRACHAN, FUNDS, INC., and TEXAS FUND, INC., Defendants-below,
Appellees.

*Supreme Court, On Appeal, June 7, 1962.*

*Irving Morris,* of Cohen & Morris, Wilmington, for appellant. *Abraham L. Pomerantz* and *William E. Haudek,* of Pomerantz, Levy & Haudek, New York City, of counsel.

*Aaron Finger,* of Richards, Layton & Finger, Wilmington for Thomas D. Anderson and others, appellees.

*James M. Tunnell, Jr.,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for Ernest T. Skinner, W. T. Carter, III, and George R. Bryant, appellees.

*William S. Potter,* of Berl, Potter & Anderson, Wilmington, for Funds, Inc., appellee.

*David W. Peck, Alfred Jaretzki, Jr.,* and *Marvin Schwartz,* of Sullivan & Cromwell, New York City, of counsel, for appellees.

SOUTHERLAND, C. J., WOLCOTT, J., and CAREY, Judge, sitting.

SOUTHERLAND, Chief Justice: This is a suit by a minority stockholder of Texas Fund to recover from certain of the defendants profits alleged to have been illegally made.

The facts are fully set forth in the first opinion of the Chancellor *ante, p.* 61, 173 *A.2d* 626, to which reference is made for a detailed statement. For our present purpose they will be very briefly summarized.

Texas Fund is an investment trust subject to the provisions of the *Investment Trust Act* of 1940. 15 *U.S.C.A.* § 80a. It was organized in 1949 to invest in enterprises in southwestern United States. Its investment adviser was Texas Management Company.

Under the terms of a management contract approved by Texas Fund directors and stockholders, the Management Company provided investment advice and administrative services. Two of its stockholders, Thomas D. Anderson and Theodore E. Swigart, were directors of Texas Fund.

In 1959 some of the principal stockholders of the Management Company negotiated for the sale of their stock to another group of successful business men. Two of that group submitted a written offer to buy all or part of the shares (not less than 70%) for $1,350,000, or the proportionate part thereof. This was a sale of a controlling block of stock, and under the Investment Trust Act such a sale automatically terminates the management contract. 15 *U.S.C.A.* § 80a–15. Hence the purchase was conditioned upon the approval of the stockholders of the reinstatement of the management contract. Ar-

rangements were also made for changes in the boards of directors of the two companies and in the advisory committee of the Management Company.

A special stockholders meeting of Texas Fund was called. The stockholders approved the reinstatement of the management contract by a 99% majority of those voting. In March, 1960, the shares sold were transferred to defendant, Texas Funds, Inc., formed to hold title to them. The service contracts were declared terminated and reinstated at once.

Apparently the consummation of the matter was delayed because of this suit. Plaintiff filed the suit on March 1, 1960.

The complaint alleges that the directors of both Texas Fund and Management Company were fiduciaries for the Texas stockholders. It then alleges that the Texas directors agreed to use their offices to procure stockholders' approval of the management contract. It then avers that what was done constituted "an abdication by the board of directors of Texas Fund" of their responsibility, as a result of which there was procured for the defendants the sum of $1,227,000. This amount appears to be the difference between the book value of the shares and the purchase price.

The theory of the complaint is not wholly clear. Certainly, as the Chancellor said, it asserts no claim under the Investment Trust Act. However, as the result of two motions of the defendants for summary judgment, and two opinions of the Chancellor, the basic issue between the parties became clear. That issue was the value of the Management Company's stock. No contention is made that there is anything wrong with the terms of the management contract, or with the change in management. It is admitted that the Texas Fund stockholders have suffered no monetary loss. Nor is it contended that the value of the Management Company stock over and above its book value is, as a matter of law, an asset of Texas Fund. This contention was rejected by the Ninth Circuit Court of Appeals in *Securities and Exchange Commission v. Insurance Securities, Inc.*, 254 *F.2d* 642, cert. denied 358 *U.S.* 823, 79 *S.Ct.* 38, 3 *L.Ed.2d* 64. Plaintiff's case is this:

The Texas Fund directors were five. Two were stockholders of Management Company. The other three, it is said, were wholly dominated by the Management Company. This contention is developed by the plaintiff at great length, in response to the defendants' contention that the three directors were independent. The Chancellor did not resolve this issue, and we do not reach it.

It is further charged that the Fund directors used their offices—"sold them," it is said—to obtain an illegal premium for the management stockholders, and that the defendants should account for that premium. The premium is illegal, says plaintiff, because the true value of the Management Company stock was far less than its selling price.

Now, it is plain that the foundation of this argument, and hence the crucial issue between the parties, is as above indicated: Whether the Management Company stock was worth what was paid for it. As the Chancellor indicated, if the selling stockholders received only the value of their shares, there was no illegal premium and the directors of Texas Fund could not be guilty of the trust complained of.

Subsequently plaintiff conceded that non-control shares of management companies had been sold at prices ranging in the neighborhood of 37 times earnings. He also conceded that the per share price paid for the Management Company stock was within the same capitalization rate. Plaintiff further specifically conceded that if the control shares had the same value as non-control shares, he was out of court.

Thereupon the Chancellor granted defendants' second motion for summary judgment.

Plaintiff earnestly challenges the finding that the control shares sold had the same value per share as non-shares. His argument runs as follows:

If the controlling shares of Management Company stock were freely transferable, their value might well be measured by the value of non-control shares. But they are transferable only by suffering the penalty of losing their chief assets—the management contract and the good will attributable to it. This good will is immediately seriously impaired, if not lost, because the renewal of the management

contract by the stockholders, and its future yearly approval by the directors, are quite uncertain. Hence no prudent buyer, however willing, would pay the value that the shares had in the hands of the owners, for he could not be sure of continued earnings.

So runs the argument.

When applied to this case, its fallacy is manifest. The sale was conditioned upon reinstatement of the management contract. When the buyers paid their money, they got exactly what the sellers had and hence paid no more than the shares were worth.

This conclusion is unaffected by the charge that the Texas Fund directors were dominated by the sellers. Let that be assumed—contrary to the vigorous denials of the defendants. What wrong has been done to the Texas Fund stockholders? We would, then have the familiar case of an interested board, a situation calling for stockholders' approval and for an independent examination by a court of the fairness of the transaction. But here there is no question of fairness to examine, because the fairness of the contract and of the changes in management is not attacked. Plaintiff adds another argument. He says that the course adopted by the dominating directors deprived Texas Fund of the opportunity of inviting competing bids for management services. If such bids had been called for after the sale of the stock a competing group, he says, might have outbid the purchasers, and Texas Fund might have made a better bargain.

There is nothing in the record to support this contention. It is mere speculation. Whether to solicit bids from several groups, or to deal with one only, was a question of business judgment. It may be replied again that the directors were interested, and that the decision must be scrutinized by a court. If so, we can find nothing wrong with what was done, since it preserved a real continuity of a management that had been successful.

In conclusion, we observe that the approval of plaintiff's contention would lead to an anomalous result. Owners of stock of a management company who have built up the value of their shares through the years by the exercise of business ability and good judgment are forbidden ever to reap the reward of their labor. In other

words, they can never sell the shares for what they are really worth. This conclusion offends one's sense of fairness. If overriding considerations of public policy requires a curb on the right of owners of management contracts to realize the full value of their assets, it is for Congress to say so. *Cf.* the comments in 68 *Yale L.J.* 134–137.

We think that the Chancellor's decision was right. Judgment affirmed.