Mary KUKMAN et al., Plaintiffs,
v.
Alvin H. BAUM et al., Defendants.

Joseph MICONE et al., Plaintiffs,
v.
INTERNATIONAL INDUSTRIES, INC.,
et al., Defendants.

Ruth Marguerite STICKLER, Plaintiff,
v.
INTERNATIONAL INDUSTRIES, INC.,
et al., Defendants.

Neil UNDERBERG, Plaintiff,
v.
SELECTED AMERICAN SHARES, INC.,
et al., Defendants.

Nos. 71 C 2065, 71 C 2160, 71 C 2384
and 71 C 2753.

United States District Court,
N. D. Illinois, E. D.
July 10, 1972.

Alex Elson, Elson, Lassers & Wolff, Chicago, Ill., for plaintiffs.

Edward H. Hatton, Donald R. Harris, Joan M. Hall, Lynne E. McNown, Jenner & Block, Milton H. Cohen, Mitchell S. Rieger, David S. Ruder, Allan Horwich, Schiff, Hardin, Waite, Dorschel & Britton, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The motions were filed in the case of Stickler v. International Industries, Inc., 71 C 2384.

Three mutual funds are involved in the instant litigation: Selected American Shares, Inc. (hereinafter referred to as "Selected American"); Selected Special Shares, Inc. (hereinafter referred to as "Selected Special"); and Selected Opportunity Fund, Inc. (hereinafter referred to as "Selected Opportunity"). All three are open-end mutual funds organized pursuant to the laws of the State of Delaware having their principal place of business in the State of Illinois. All three are investment companies registered pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80a–1 to 80a–52 (hereinafter referred to as "the Act"). Plaintiff Stickler is the record and beneficial owner of approximately 2,476 shares of common stock of Selected American and has continuously so held such shares since prior to September, 1966.

Security Supervisors, Inc. (hereinafter referred to as "Supervisors"), an Illinois corporation, is the investment adviser for these three funds. Thus, pursuant to a management agreement between the fund and Supervisors, Supervisors furnishes investment advice and management services to each fund.[1] For these services, Supervisors receives a monthly fee calculated on the net value of the fund's assets.

Supervisors also acts as principal underwriter for each fund pursuant to an underwriting agreement between the fund and Supervisors. As principal underwriter, Supervisors acts as agent of the funds in selling their shares, at a discount from the public offering price, to dealers who in turn sell the shares to the public at the applicable public offering price.

Investors buy shares in the funds at the applicable public offering price, which is net asset value per share,[2] plus a specified sales charge. A shareholder may at any time require the fund to redeem his shares for cash at net asset value per share.

General supervision of the affairs of each fund is entrusted to its board of directors. Until 1970, the Act, which regulates the internal affairs of registered investment companies, required that a majority of the directors of a fund not be affiliated with the principal underwriter and at least forty percent not be affiliated with the investment adviser. In 1970, the Act was amended to broaden the group of persons who would be excluded from serving as mutual fund directors by substituting the term "interested person" in section 10, 15 U.S.C. § 80a–10, for the term "affiliated person". In the instant case, the stricter requirements of the 1970 amendments were fulfilled at all times.

Count I of the complaint, the only Count at issue in the instant motion, seeks to recover for the three funds a large portion of the purchase prices paid to stockholders of Supervisors in two transactions: (1) the sale in 1969 by certain stockholders of Supervisors of 80% of its stock to defendant International Industries, Inc. (hereinafter referred to as "International"); and (2) the resale in 1971 by International of that 80% of the stock of Supervisors and the sale by the other stockholders of the remaining 20% of the stock to defendant Lincoln National Corporation (hereinafter referred to as "Lincoln"). To effectively understand the gravamen of the complaint, it is necessary to examine these transactions in detail.

In early 1969, slightly less than 80% of the stock of Supervisors was owned

1. The services rendered by Supervisors include supervision of investment; investigation and analysis of companies, securities, general business and economic conditions; and furnishing of such statistical, administrative, and bookkeeping services, office space, equipment, executive and clerical personnel as may be necessary to provide investment advice and general management to the funds.

2. Net asset value per share is determined by dividing the excess of the value of the fund's assets over its liabilities by the number of shares outstanding.

by defendants Alvin H. Baum, Edward P. Rubin, Carl Holzheimer and Harry L. Sebel. Each of these men had been associated with Supervisors or Supervisors' predecessors for many years [3] and they constituted the senior management team of Supervisors.[4] They adopted a policy of building an expanded management group for Supervisors and, as a result, they developed a group of eight younger executives who assumed increasing responsibilities for rendering management and advisory services to American Selected and the investment portfolios managed by Supervisors.[5]

Sometime in early 1969, when Baum, Rubin, Holzheimer and Sebel were all close to or over 65 years of age and nearing retirement, negotiations were conducted for the sale of the stock interest of these four seniors to International. The essentials of the sale were as follows:

1. The approximately 80% stock interest in Supervisors owned by Baum, Rubin, Holzheimer and Sebel was sold to International for an aggregate purchase price of approximately $8,852,000 in cash and $1,550,000 in International's 5⅞% subordinated promissory notes, convertible into shares of common stock of International at $62.97 per share.[6]

2. Baum, Rubin, Holzheimer and Sebel each remained as advisers to Supervisors.

3. Baum, Rubin, Holzheimer and Sebel each executed a three-year covenant not to compete with Supervisors for a consideration of $5,000 to each.

4. The remaining 20% stock interest in Supervisors was retained by the eight younger executives under option agreements with International which prohibited sale or disposition of their shares for three years, subject to certain specified exceptions. After three years, each executive had an option to sell his shares to International, and after six years, International had an option to buy the executive's shares.

5. Four of the younger executives (Horwich, Neisser, Peckenpaugh and Vaicek) executed three-year employment agreements with Supervisors.

6. Supervisors and International signed a statement of intention to govern the conduct of the affairs of Supervisors after the stock sale. The essential points of the statement were:

(a) Supervisors would continue to operate its business autonomously and as a separate corporation;

(b) a majority of the directors of Supervisors would be comprised of its active full-time officers and employees;

(c) no change was contemplated in the investment policies or operating management of the mutual funds managed by Supervisors;

(d) the final responsibility for all investment decisions would rest with Supervisors, acting in conjunction with the directors of the funds; and

(e) the transaction would complete the transition of full responsibility for operations of Supervisors to the younger management group, with assistance from the senior management whose stock was sold and who would remain as advisers.

---

3. Baum was the co-organizer of Supervisors' first predecessor in 1930; Rubin was hired as an employee of Supervisors sometime before 1933; Holzheimer joined as an employee in 1936; and Sebel joined as an owner in 1955.

4. Each was an officer and director of Supervisors in early 1969.

5. These eight executives are: Defendants Herbert F. Horwich; William R. Pitzele, Carl W. Vaicek, Jr.; Theodore Bosler; Edward Neisser; Robert E. Peckenpaugh; Curtis Lieb; and Sheldon R. Stein. On September 10, 1969, Horwich and Peckenpaugh became directors of Supervisors; they were officers prior thereto.

6. A small portion of the stock of Horwich and Peckenpaugh was also sold in order that International would own 80% of the stock of Supervisors.

Since under sections 2(a)(4) and 15 of the Act, 15 U.S.C. §§ 80a–2(a)(4) and 80a–15, the sale of shares of Supervisors would be treated as an assignment resulting in termination of the management and underwriting agreements between Supervisors and the funds, shareholder approval of the new agreements was necessary. Accordingly, completion of the transaction was conditioned upon approval of new management and underwriting agreements by the shareholders of the funds.

In May of 1969, the board of directors of Selected American and Selected Special [7] were identical and consisted of seven individuals only one of which, Rubin, was either "affiliated" or "interested" in Supervisors.[8]

The proposed transaction with International was discussed with the funds' directors at meetings held on May 9, 1969, and May 14, 1969. Information about the proposed transaction and arrangements for preserving management continuity was presented to the directors. At the meetings on May 14, 1969, the directors discussed proposed new management and underwriting agreements with Supervisors. The directors decided that the agreements should provide for an initial term of one year and that, in all other respects, the agreements were to be identical with the agreements then in effect. In their resolutions calling for meetings of shareholders to consider the new agreements, the directors specified that the management proxy statements were to have prior board approval. They required that preliminary proxy material be sent to each director for his study and stated that they would hold a future meeting to review in detail and make any changes in the proxy material they considered appropriate. The agreements between International and the shareholders of

Supervisors were signed on May 14, 1969, after the directors' meetings.

On June 2, 1969, the directors held meetings to review the draft proxy material previously sent to them. After a general discussion, the proxy material of each fund, including the proposed letter to shareholders, was carefully reviewed by the directors. Suggested changes were discussed in detail, and a final version was agreed upon by the directors. The directors thereupon adopted resolutions recommending to the shareholders the continuation of Supervisors as investment adviser and principal underwriter under new management and underwriting agreements and approving the proxy material which had been considered and amended by the boards.

At special meetings held on August 20, 1969, the shareholders of Selected American and Selected Special approved the new management and underwriting agreements. On September 10, 1969, the sale to International of 80% of the stock of Supervisors was closed and the new management and underwriting agreements became effective.

As a result of this transaction, Plaintiff alleges, the sellers of the Supervisors stock received in the form of cash and promissory notes an excess over book value of the stock sold of approximately $10,000,000.

With the approval of the directors of the two existing funds, a new mutual fund, Selected Opportunity, which had been organized by Supervisors and for which Supervisors served as investment adviser and principal underwriter, was offered to the public in August 1970.

By the end of 1970, the transition in management responsibility from the former senior executives to the younger group had been completed. The four advisers resigned their positions in the

7. Selected Opportunity was not offered to the public until August 1970.

8. The other six were: Philip M. Hauser, John K. Langum, Edgar Peske, P. P. Stathas, Kenneth Russ, James C. Worthy.

With the exception of Rubin and Stathas, each of these men continues to serve currently as a director of the funds managed by Supervisors.

last few months of 1970.[9] The eight younger executives, now the principal officers, remained in charge of Supervisors.

In late 1970 and early 1971, International began to experience liquidity problems which required it to consider the sale of investments in certain subsidiaries. Supervisors was in that category, and International decided to sell its shares in Supervisors.

Lincoln, an Indiana corporation with its principal place of business in that State, proposed to acquire all of the outstanding stock of Supervisors. The total purchase price to be paid by Lincoln was approximately $6,400,000, of which $4,500,000 was to be paid for International's 80% stock interest [10] and $1,900,000 was to be paid to the eight individual shareholders for their 20% stock interest.[11]

As a part of the proposed transaction, four of the eight executives were to sign new employment agreements with Supervisors for terms of three years. The employment agreements of two of the other executives, each with a remaining unexpired term of some 18 months, were to remain in effect. Again, since under the Act sale of the shares of Supervisors would automatically terminate the management agreements between Supervisors and the funds, the transaction was conditioned upon approval of new management agreements by the funds' shareholders.

The proposed transaction with Lincoln was discussed at meeting of the board of directors of the three funds on March 11, 1971. Information about the proposed transaction and arrangements for preserving management continuity was presented to the directors. The boards of directors of each fund then consisted of more than a majority of persons who were not affiliated with or inteersted in supervisors.[12]

At the meeting, the directors approved the continuation of Supervisors under new management agreements and adopted resolutions which provided for meetings of shareholders to consider them. The new management agreements and underwriting agreements were identical to the existing agreements and had an initial term of one year. The agreement between Lincoln and the stockholders of Supervisors for the sale of shares of Supervisors was signed on March 13, 1971.

The new management agreements were approved at meetings of the shareholders of Selected American, Selected Special, and Selected Opportunity on May 20, 1971. Following the shareholders' meetings, the sale to Lincoln of all of the stock of Supervisors was closed and the new management and underwriting agreements became effective.

As a result of this transaction, Plaintiff alleges, the sellers of the Supervisors stock received an excess over book value of the stock sold of approximately $5,787,000.

Plaintiff's complaint is that in both the 1969 and 1971 transactions, the shareholders of Supervisors assigned a fiduciary office, that of investment ad-

9. Simultaneously, Rubin resigned as charman of the board, a director, and president of Selected American and as chairman of the board and a director of Selected Special.

10. International thus sustained a loss of approximately $5,902,000 on the 80% stock interest it had purchased 20 months earlier.

11. Under the agreement of sale with Lincoln, International and the eight individual shareholders cancelled the option agreements between them which had been signed in the 1969 transaction. The op-

tion agreements included a provision that upon the sale by International of a majority of the stock of Supervisors, the eight individual shareholders could require International to purchase their shares at an aggregate price of approximately $2,598,000. Had the option agreements not been cancelled, this provision would have become applicable by reason of the sale by International to Lincoln.

12. In addition to Hauser, Langum, Peske, Russ and Worthy, *supra* footnote 8, the directors included William G. Cole and Robert J. Greenbaum.

viser to and underwriter for the funds, at a profit; accordingly, plaintiff asserts that all such profit belongs to the funds as a matter of law. In support of her assertion, plaintiff relies heavily upon one recently decided case. A close examination of that case, therefore, is necessitated.

In Rosenfeld v. Black, 445 F.2d 1337 (2nd Cir. 1971), the Court was faced with the following facts: The defendant Lazard Freres & Co. (hereinafter referred to as "Lazard"), a partnership, served as the investment adviser to the Lazard Fund. The eight-man board of the Lazard Fund included two Lazard partners, who were also the president and chairman of the board of the Lazard Fund; a senior member of Lazard's counsel was likewise on the board.

After serving as investment adviser for nine years, Lazard decided, for reasons not here relevant, that its continuation in that position was no longer in the interest of the Lazard Fund. With the approval of the directors of the Lazard Fund, Lazard selected the defendant Dun & Bradstreet, Inc. (hereinafter referred to as "D&B") as its successor.

In order to effectuate the transfer of the advisory office, D&B, acting through various subsidiaries, organized a new fund (hereinafter referred to as the "Capital Fund") with a nominal capital. The Lazard Fund was to be merged into the Capital Fund and a second tier subsidiary of D&B was to serve as the investment adviser of the merged entity under an agreement similar to that previously in effect between Lazard and the Lazard Fund. At the same time, Lazard entered into an agreement with D&B which required D&B, upon consummation of the merger, to transfer 75,000 shares of its stock worth $3,000,000 to Lazard. The ostensible consideration for the 75,000 shares consisted of certain covenants of Lazard. The plaintiffs, however, contended that the covenants were a sham and that the transfer of office was, at least in major part, the true consideration. The District Court granted summary judgment for the defendants, Rosenfeld v. Black, 319 F.Supp. 891 (S.D.N.Y.1970), stating:

"Plaintiffs . . . argue that the existing advisory contract was an asset of the Fund, transfer of which for gain to D&B violated defendants' statutory and common law fiduciary duty to the shareholders. We cannot accept the basic assumption that the contract is a Fund asset. . . . Even assuming Lazard's position, while the contract here was in force, to be that of a fiduciary . . ., the Fund could not require it to render services beyond the 60-day termination period.[13] Nor was the contract assignable by either party.[14] Thus Lazard was free, upon 60 days notice, to cease rendering service to the Fund and to render its service elsewhere." 319 F.Supp. at 897–898 [footnotes added].

The Court later stated:

"The same reasons leading us to the conclusion that on plaintiffs' own version of the facts there was no violation of the Act persuade us that there was likewise no breach of defendants' common law fiduciary duties as asserted in plaintiffs' pendent claim." 319 F.Supp. at 899 [footnote omitted].

The Court of Appeals for the Second Circuit, in reversing and remanding the District Court's decision, made three holdings: (1) It held that an investment adviser is a fiduciary with respect to the mutual fund that it advises; (2) it held that under common law principles the beneficiary of this fiduciary relationship is entitled to recover all profits realized

13. Section 15(a) (3) of the Act, 15 U.S.C. § 80a-15(a) (3) provides that all advisory contracts can be terminated by the board of directors of a fund on 60 days written notice.

14. Pursuant to sections 2(a) (4) and 15 of the Act, 15 U.S.C. §§ 80a-2(a) (4) and 80a-15.

by the fiduciary on the fiduciary's sale of its office; and (3) it held that these common law principles are "impliedly incorporated" into the Act.

Defendants urge this Court not to follow the *Rosenfeld* decision for two reasons: (1) It is factually distinguishable from the instant case and (2) it was erroneously decided. Each of these contentions will be considered separately.

## I. IS ROSENFELD FACTUALLY DISTINGUISHABLE FROM THE INSTANT CASE?

The issue before the *Rosenfeld* court, as defendants see it, is whether the shareholders of the Lazard Fund could recover the profit received by Lazard on the transfer of its fiduciary office. In the instant case, defendants contend, there was no termination of Supervisors' investment adviser relationship with the three funds; the only transfers that occurred were the sales of controlling blocks of Supervisors' stock. Throughout the course of the complained of transactions, Supervisors has remained investment adviser to the funds.

It is clear that the *Rosenfeld* court reserved decision on the issue of whether the sale of controlling shares of an investment adviser was distinguishable from the sale of the investment business itself. The Court stated:

> " . . . we do not find it necessary at this time to determine whether the difference between a transaction such as that here before us and the sale of a controlling block in a corporate adviser at a price reflecting the expectation of profits under a renewed contract with the corporation which the sellers were to aid in procuring, is sufficiently substantial to warrant a different result in this latter case . . . ." 445 F.2d at 1346.

■ Defendants contend that because there was no change in either Supervisors' managing personnel or in the management policies followed by Supervisors as a result of the 1969 and 1971 transfers of Supervisors' controlling stock, there was no effective transfer of the fiduciary office. This Court is of the opinion that defendants' contention is without merit.

While it is true that the same personnel was retained and the same policies were followed after the transfers of Supervisors' controlling stock, it does not follow that there was no transfer of the fiduciary office. Surely, the mere retention of Supervisors' corporate name and shell affords no basis for stating that there was no transfer of the office. Similarly, the agreement to retain the old personnel offers no basis for such an assertion. Personnel will eventually be retired or terminated and replaced by those persons in control of the investment management corporation. Further, the promises not to change management policies made by the purchasers of the controlling stock may well conflict with and be subordinated to the fiduciary's responsibility to alter management policies in light of changing business or economic conditions.

Accordingly, this Court holds that there is no intellectually sound way to distinguish the facts in the instant case from those in *Rosenfeld*.

## II. DOES ROSENFELD CORRECTLY STATE THE LAW?

■ As stated hereinabove, the Second Circuit, in deciding *Rosenfeld*, made three holdings: (1) It held that an investment adviser is a fiduciary with respect to the mutual fund that it advises; (2) it held that under common law principles the beneficiary of this fiduciary relationship is entitled to recover all profits realized by the fiduciary on the fiduciary's sale of its office; and (3) it held that these common law principles are "impliedly incorporated" into the Act.

The first two holdings are so obviously correct that no citations are needed to support them. If there is error in the *Rosenfeld* decision, therefore, it must have been in the third holding.

In SEC v. Insurance Securities, Inc., 254 F.2d 642 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed. 2d 64 (1958), the Court was confronted with a factual situation very similar to the instant one. Four individual defendants who owned controlling stock interests in an investment management company (hereinafter referred to as "Service Company") which advised a mutual fund sold their controlling interests at a price exceeding book value of the stock. Because the sale would terminate the management contract, Service Company solicited proxies for a meeting of the fund's shareholders in order to have the management contract reaffirmed.

The Securities and Exchange Commission, in attacking the sale, requested several remedies including the following:

> " . . . that the individually named defendants be required to account for the profits realized upon the sale of their shares in Service Company, alleged to be approximately $4,240,000 in excess of the net book value of such shares." SEC v. Insurance Securities, Inc., 146 F.Supp. 778, 779 (N.D.Cal.1956).

The Court of Appeals, in affirming the District Court's dismissal of the complaint, noted:

> "The purchase price [received by the four individual defendants] therefore necessarily reflected the value which the service company does and will derive from the fees paid, and expected to be paid, by Trust Fund." 254 F.2d at 646 [footnotes omitted].

The Court, reviewing the Congressional Findings and Declaration of Policy contained in section 1(b)(6) of the Act, 15 U.S.C. § 80a–1(b)(6), which censure transfer of control or management of a mutual fund without the consent of the fund shareholders, commented on the absence of any relationship between the Congressional purpose and the price paid for shares of an investment adviser:

> "The circumstance which is objectionable under this statutory pronouncement is transfer of control without consent, however achieved and whatever the consideration therefor. No language used in this section, or elsewhere in the act, indicates that the price paid for such a transfer of control is a circumstance to be considered." 254 F.2d at 649.

The Court then reviewed the provisions of the Act which implement the Congressional Declaration of Policy regarding the sale of controlling shares of a management company. As noted hereinabove, these provisions require automatic termination of the management agreement upon such a sale and approval of any new management agreement by the fund's shareholders. The Court noted:

> "Here again, the sanction runs against any assignment, whatever the price paid and received therefor. An assignment at net asset value is just as fruitless under this section as one for a substantial price in excess of such value. In either case, the contract is automatically terminated. In no respect is the amount paid or received for stock control made a factor to be considered." 254 F.2d at 649 [footnote omitted].

In Krieger v. Anderson, 40 Del.Ch. 363, 182 A.2d 907 (1962), the principal stockholders of a management company which served as investment adviser to a fund registered under the Act sold a controlling block of stock. A derivative suit was filed by the stockholders of the fund to obtain for the fund an amount which, the Court noted, "appears to be the difference between the book value of the shares and the purchase price." 182 A.2d at 908. The Court affirmed a lower court's granting of summary judgment for the defendants.

In 1967, when Congress undertook revision of the Act, it was aware of both the *Insurance Securities* and *Krieger* cases since it had before it the SEC's 1966 report entitled "Public Policy Im-

plications of Investment Company Growth" (hereinafter referred to as "1966 SEC report") ; [15] this report contained a section devoted specifically to the topic "Sales of Management Organizations" which included a discussion of those cases.[16]

In this report, the SEC, apparently abandoning the position it had taken in the *Insurance Securities* case, noted that harmful effects to mutual funds might follow an arbitrary rule prohibiting profit upon the sale of shares of a management company:

> "The absence of an opportunity to capitalize to some reasonable degree on the future earnings obtainable from this relationship could also be harmful to the fund, since existing management might be reluctant to surrender that relationship and to provide the fund with new and possibly more effective management." 1966 SEC report at 152.

The SEC's new position was that while the right to make such a sale should be preserved,[17] sales which impose additional burdens on the mutual fund should be restrained:

> "The proposed amendment would not authorize the Commission or the courts to determine whether or not owners of advisory organizations should dispose of their interests. Nor will the amendment empower the Commission or the courts to prescribe or to limit the consideration that a retiring adviser can obtain from the successor." 1966 SEC report at 152–53.

The SEC's draft bill, which was introduced in 1967 as S.1659, H.R.9510 and H.R.9511 in the 90th Congress, 1st Session, would have added to the Act a new section 15(g) containing a burdens theory. The technical statement supporting the bill stated:

> "The proposed amendment would be limited in its application to those cases in which the new advisory relationship is in view of all pertinent circumstances more burdensome to the fund than the old one was." [18]

Following consideration of the original bills, a Senate substitute bill, S.3274, was introduced. This bill omitted the SEC's section 15(g) and its burdens theory, with the comment that the provision was unnecessary since section 36 of the Act, which authorizes the SEC to bring enforcement actions, was being broadened to create a new section 36(a), which would allow the SEC to "seek court injunctions against breaches of fiduciary conduct involving personal misconduct." The Senate Report accompanying the amendment to section 36 stated:

> "A breach of fiduciary duty involving personal misconduct in connection with the transfer of a management organization would be actionable under Section 36 in the same manner as other violations of the statute. *Your committee sees no need to single out transfer situations for special treatment.*" S.Rep.No.1351, 90th Cong., 2nd Sess., 12 (July 1, 1968) [Emphasis added].

The amendments creating section 36(a) were adopted in the form contained in a 1970 House report, which stated that section 36(a) was "not intended to provide a basis for the Commission to undertake a general revision of the practices or structures of the investment company industry." H.R.Rep.

15. H.R.Rep.No.2337, 89th Cong., 2nd Sess. (1966).

16. 1966 SEC report at 149–53.

17. The SEC stated:
"It [the SEC] believes that a fuller measure of protection can be given without interfering with the ability of investment company managers to dis-
pose of their interests in advisory organizations." 1966 SEC report at 152.

18. Spec.Rep.No.146 on S. 1659, H.R. 9510, Inv. Co. Amendments Act of 1967, "Technical Explanation of the Bill by the Securities and Exchange Commission", CCH Fed.Sec.L.Rep. (May 8, 1967) at 13.

No. 91–1382, 91st Cong., 2nd Sess., 37 (August 7, 1970).

The provisions of the Act which require fund shareholder approval of the management agreement after a sale of controlling shares are based upon the concept of "assignment".[19] "Assignment" is defined in section 2(a)(4) to include transfer of controlling shares of the investment adviser. Prior to the 1970 amendment, section 15(a)(4) referred to "assignment by the investment adviser"; the amendment deleted the words "by the investment adviser". The reason for the amendment is as follows:

> "Section 2(a)(4) of the Act defines the term 'assignment,' among other things, as occurring when some action is taken by persons other than the investment adviser or underwriter. Thus, under the definition, assignment includes any direct or indirect transfer of a controlling block of outstanding voting securities by a security holder of the adviser or underwriter. Section 15, however, introduces an ambiguity into the Act because it refers only to an 'assignment' by the adviser or underwriter itself and not by a person holding a controlling block of stock of the adviser or underwriter. *The proposed amendment will remove this possible ambiguity without making a substantive change in the existing law.*" H.R.Rep.No.1382, 91st Cong., 2nd Sess., 25 (1970) [Emphasis supplied].

The following conclusions can be drawn from this Court's discussion of the legislative history of the 1970 amendments to the Act: The SEC has abandoned the position it took in the *Insurance Securities* case that profits on the sale of a management company are recoverable by the mutual funds that are under contract with the adviser.[20] The SEC did suggest, however, that such sales should be precluded if added burdens were thereby imposed on the funds.

Instead of accepting the SEC's burdens theory, Congress enacted amendments broadening section 36 of the Act. Congress also amended the Act to refine section 15(a)(4) which provides for automatic termination of a management agreement upon its assignment. In passing those amendments, Congress cautioned that it did not intend (1) to single out transfer situations for special treatment, (2) to provide a basis for the SEC to undertake a general revision of industry practices, or (3) to make a change in the substantive law providing safeguards upon the transfer of controlling shares of an investment adviser.

Thus, aware of the decisions in the *Insurance Securities* and *Krieger* cases, Congress, in 1970, enacted comprehensive amendments to the Act but declined to alter the result of those cases. The United States Supreme Court has often held that failure of Congress to amend a statute under such circumstances is persuasive evidence of adoption by Congress of the judicial construction. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 14, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); Missouri v. Ross, 299 U.S. 72, 75, 57 S.Ct. 60, 81 L. Ed. 46 (1936).

Rosenfeld v. Black, *supra*, treated a similar discussion of the legislative history of the 1970 amendments to the Act thusly:

> "The second and even more important inference we are asked to draw is that, by failing to adopt the SEC's proposal, Congress indicated an intention to exclude all remedies other than termination of the old contract and the need for stockholder approval of the new one, even if such approval

---

19. Section 15(a) (4) of the Act, 15 U.S.C. § 80a–15(a) (4), provides for automatic termination of a management agreement upon its assignment.

20. Expressions and actions of the SEC concerning the Act are entitled to great weight, since Congress has entrusted the SEC with administration and enforcement of the Act, 15 U.S.C. §§ 80a–38, 40, and 42.

was obtained by an adviser who was realizing a profit. We have been cited to nothing in the committee reports, in the floor debates, or even in the hearings that casts light on the failure to enact the proposal, or shows that the SEC seriously pressed it. As is well known, the SEC had other, and more important, fish to fry." 445 F.2d at 1348.

With all due respect, this Court is of the opinion that the *Rosenfeld* Court's treatment of this legislative history is both superficial and highly subjective. There is no indication anywhere that Congress, by enacting the 1970 amendments, intended to legislatively overrule the *Insurance Securities* and *Krieger* cases. Indeed, there is much affirmative evidence that Congress did not want to change the substantive law concerning transfers of management companies.

The *Rosenfeld* Court stated:

"When Congress, in § 15(a), required shareholder approval of any new advisory contract, it must have meant an approval uninfluenced by any improper motivations on the part of the outgoing adviser-fiduciary. If lured by the possibility of profit, the retiring adviser might recommend a successor who was less qualified or more expensive than other candidates, and who might be on the lookout for ways to recoup his 'succession fee' at the expense of the Fund. . . . There is thus every reason for believing that Congress meant to adopt the established prophylactic rule." 445 F.2d at 1345.

No citation of authority is given for the last sentence since, of course, there is none. Accordingly, it is with the last sentence of the above-quoted proposition of *Rosenfeld* that this Court respectfully disagrees. It is this Court's opinion that the "established prophylactic rule" has not been "impliedly incorporated" into the Act.

For a conclusion, this Court will borrow the conclusion of Justice Southerland in *Krieger v. Anderson, supra:*

" . . . we observe that the approval of plaintiff's contention would lead to an anomalous result. Owners of stock of a management company who have built up the value of their shares through the years by the exercise of business ability and good judgment are forbidden ever to reap the reward of their labor. In other words, they can never sell the shares for what they are really worth. This conclusion offends one's sense of fairness. If overriding considerations of public policy requires a curb on the right of owners of management contracts to realize the full value of their assets, it is for Congress to say so." 182 A.2d at 910.

Accordingly, it is hereby ordered, adjudged and decreed that:

(a) Plaintiff's motion for summary judgment is denied; and

(b) Defendants' motion for partial summary judgment is granted.