**Leslie S. NIZIN**

v.

**James R. BRIGHT et al.**

**Civ. A. No. 72–731–Mc.**

United States District Court,
D. Massachusetts.

Sept. 21, 1979.

---

Stanley M. Grossman, New York City, Avram G. Hammer, Boston, Mass., for plaintiff.

Jerome P. Facher, Harry T. Daniels, Hale & Dorr, Richard W. Renehan, Mary W. Nelson, Hill & Barlow, George T. Shaw, Hemenway & Barnes, Anthony E. Battelle, Sherburne, Powers & Needham, Boston, Mass., Richard Cusick, Cleveland, Ohio, for defendants.

## MEMORANDUM OF DECISION

McNAUGHT, District Judge.

Before the court are the motions to dismiss and/or for summary judgment of the plaintiffs and defendants. On July 28, 1971, the plaintiff filed a shareholder's derivative action on behalf of Pioneer Fund, Inc., a mutual fund. The complaint essentially asserts that the directors of the Fund, as well as the Fund's investment adviser, PMC, breached their fiduciary duties to the Fund by selling the adviser's fiduciary office for private gain. The parties agree that the central issue is whether this circuit will follow the Second Circuit's decision in *Rosenfeld v. Black,* 445 F.2d 1337 (1971), *cert. dismissed,* 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972), which held that the common law prohibition against the sale of a fiduciary office for profit was incorporated into the Investment Company Act of 1940, 15 U.S.C. §§ 80a–1, *et seq.* It is my opinion that *Rosenfeld* would not, and should not, be followed here, and that, therefore, the motions should be granted in favor of the defendants. A view of the Ninth Circuit Court of Appeals of this problem, and its resolution, are preferable, and I believe should be adopted in this circuit.

Pioneer Fund is a Massachusetts mutual fund registered as an open-end management investment company under the Investment Company Act of 1940. Fund Research and Management, Inc., a Delaware corporation, is the principal underwriter of the Fund. Pioneering Management Corp., is a subsidiary of Fund Research, is the investment adviser to the Fund and provided the Fund with investment advice under a management contract.

In 1968, Western Reserve Holding Corp. exchanged shares of its stock, through a merger, for all of the outstanding stock of Fund Research which itself owned 100% of Pioneer's outstanding stock. Fund Research was to be merged with FRM Corp., a wholly-owned subsidiary of Western. Western would thereupon become the new owner of the fiduciary office which Pioneer had with the Fund. Because of provisions in the Investment Company Act which state that an investment advisory contract is terminated upon its assignment, (and the transfer of a controlling block of stock of an investment adviser constitutes an assignment under the Act) and which conditions a new contract upon approval of a majority of the stockholders of the Fund, the merger was conditioned on reinstatement by the Fund's stockholders of the advisory contract with Pioneer and the underwriting contract with Fund Research. Approval of such contracts was requested in proxy material sent to the Fund's shareholders on August 8, 1968. The shareholders approved the agreements on September 13, 1968.

The plaintiff asserts that the merger constituted a sale of fiduciary positions (the investment adviser) in violation of the Act and of common law and that the Fund is entitled to receive profits earned by the Fund's underwriter and its investment adviser since the stock transfer. Suit is brought against the former shareholders of Fund Research; Western, which acquired the stock in Fund Research; Pioneer, the

investment adviser; Fund Research, the Fund's underwriter; the Fund's directors in 1968; and Pioneer's officers and directors.

The defendants have moved for summary judgment on the grounds, *inter alia,* that if *Rosenfeld, supra,* is not followed by this Circuit, the complaint fails to state a claim; and that the action was not brought within the applicable statute of limitations, which would be the two-year Massachusetts tort statute of limitations.

Until the Investment Company Act was amended in 1975,[1] there was no language expressly prohibiting or restricting the sale or transfer of control of an investment adviser's office for profit. The preamble to the Act notes the past abuses with respect to investment companies and states the Act's basic congressional purpose which is to mitigate and eliminate the conditions enumerated in the preamble that adversely affect the national public interest and the interest of investors. 15 U.S.C. § 80a–1 (1970). The only enumerated condition relevant to the issue at hand is § 1(b)(6) which refers to the problem "when the control or management [of investment companies] is transferred, without the consent of their security holders." *Id.* § 80a–1(b)(6).

Section 15(a) makes it unlawful for any person to act as an investment adviser unless he acts pursuant to a written contract approved by a majority of outstanding voting shares of the fund. 15 U.S.C. § 80a–15(a) (1970). The Act further requires that the advisory contract must include a provision providing for automatic termination upon assignment by the adviser. *Id.* § 80a–15(a)(4). Assignment is defined as "any direct or indirect transfer or hypothecation of a contract . . . or of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor . . . ." *Id.* § 80a–2(a)(4). Thus, if the controlling block in an investment adviser's office or management corporation is sold, the advisory contract is auto-

matically terminated and must receive investor approval prior to reinstatement.

The only other section of the Act which arguably bears on the issue of sale of office is § 36, which as it was originally enacted, and as it applied to the present transaction in 1968, authorized the SEC to bring an action to enjoin any officer, director, or member of an investment adviser, who has been "guilty" of "gross misconduct or gross abuse of trust in respect of any registered investment company for which such person so serves or acts . . . ." C. 686, Title 1, § 36, 54 Stat. 841, *as amended* 15 U.S.C. § 80a–35 (1970).

The plaintiff here has stated that it does not allege a violation of § 36. Rather, it relies on the decision in *Rosenfeld v. Black, supra,* which held that the statute impliedly incorporated the common law principle prohibiting the sale of a fiduciary for profit. The *Rosenfeld* court rejected the notion that the "gross abuse" standard of § 36 placed any limitation whatever on profit-taking. 445 F.2d at 1346. The court seems to root its implied incorporation theory in § 15(a):

> When Congress, in § 15(a), required shareholder approval of any new advisory contract, it must have meant an approval uninfluenced by any improper motivations on the part of the outgoing adviser-fiduciary.

*Id.* at 1345.

In *Rosenfeld,* the defendant Lazard Freres & Co., the investment adviser to the Lazard Fund, a mutual fund, wished to transfer its advisory position to Moody's Advisers & Distributors, Inc., a subsidiary of Dun & Bradstreet, in exchange for shares of Dun & Bradstreet. The transfer was accomplished through the creation of a new mutual fund which would employ Moody's as adviser. Lazard induced the stockholders of the Lazard Fund to approve

---

1. Act of June 4, 1975, Pub.L.No.94–29, § 28(1), 89 Stat. 164, 165, *amending* 15 U.S.C. § 80a–15 (1970). The 1975 amendment specifies that an investment adviser "may receive any amount or benefit" for the sale of securities in the investment adviser which results in an assignment of the advisory contract provided certain criteria are met. 15 U.S.C. § 80a–15(f)(1) (Supp.1979).

its merger into the new fund and to ratify the appointment of the new adviser. Under the agreement it had with Dun & Bradstreet, and upon consummation of the merger, Lazard Freres was to receive the stock. Shareholders of the Lazard Fund brought an action seeking an accounting of the profits realized by Lazard Freres on the transfer.

The Second Circuit not only found that Lazard breached its fiduciary duty to the Fund in selling the advisory office for profit, but also held that the Investment Company Act impliedly incorporated that common law equitable principle. 445 F.2d at 1344, 1345. In reaching its incorporation theory, the Second Circuit refuted the conclusion previously drawn by the Ninth Circuit that § 15(a) of the Act, requiring shareholder approval of any new advisory contract, was the exclusive remedy in control-transfer cases. *SEC v. Insurance Securities, Inc.*, 254 F.2d 642, 651 (9th Cir.), *cert. denied*, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958).

The defendants argue that *Rosenfeld* was wrongly decided, contending that the Second Circuit ignored the legislative history of the Act which demonstrates that Congress did not intend to apply a rule applicable to common law fiduciaries to prevent the owners of a mutual fund adviser from selling their interest at a profit. Defendants note that *Rosenfeld* adopted a position rejected by *SEC v. Insurance Securities, Inc., supra*, and other cases. *See Goodman v. Von Der Heyde*, CCH Fed.Sec.L.Rep. ¶ 92,541 (S.D.N.Y.1969); *Krieger v. Anderson*, 40 Del.Ch. 363, 182 A.2d 907 (Sup.Ct. 1962). Finally, in asking this court to reject the *Rosenfeld* holding, the defendants refer to changes in policy statements by the SEC regarding sales of advisory offices for profit and to the legislative history of the 1970 and 1975 amendments to the Act.

While this court recognizes weaknesses in the authority relied on by the defendants, there does not appear to be firm support for the Second Circuit's holding. *Rosenfeld* offers no substantial authority for the implied incorporation theory urged therein.

In *SEC v. Insurance Securities, Inc.* (*ISI*), *supra*, the directors of the investment adviser of a mutual fund sold a controlling stock interest in the adviser at a price in excess of its book value. As required by the Act, the trust agreement provided that the Trust Fund's advisory and principal underwriting contracts must be approved annually by a vote of investors representing a majority of investment units of the Fund. *See* 15 U.S.C. § 80a–15(a)(2), (b)(1). The trust agreement also provided, as required by § 15(a)(4) & (b)(2) of the Act, that an assignment of the contract to serve as investment adviser for the Fund automatically terminated the contract. Thus, by virtue of the stock sale, the advisory contract was terminated. The service company thereupon sent a proxy to the Trust Fund shareholders to be signed and returned, which, in effect, called for the reinstatement of the advisory contract and the creation of a board of directors to be controlled by the new group. The SEC filed suit to enjoin the transaction, alleging that:

> [W]hen the sale of control of the investment adviser or principal underwriter involves receipt of consideration in excess of net asset value, "gross misconduct" or "gross abuse of trust," under § 36 is involved. The excess . . . represents payment for succession to the adviser's or underwriter's fiduciary office and undertakings.

*SEC v. Insurance Securities, Inc.*, 254 F.2d at 647 (footnote omitted). The lure of "excess profits," according to the SEC, was undesirable because it might lead the advisers to disregard the best interests of the Fund and might prompt the new controlling group "to pursue a hazardous or doubtful policy in an effort to recoup the purchase price." *Id.* at 648, n. 8. The SEC also argued that the "value attached to service contracts is an asset of the investment company." *Id.* at 647. The Ninth Circuit characterized the SEC's theory as follows:

> [T]he sale of a controlling interest in a service company at a price in excess of asset value is contrary to general equitable principles. These principles, it is

urged, are incorporated in § 36 of the Act.

*Id.*[2]

The Ninth Circuit affirmed the dismissal of the complaint by the district court, framing the issue as follows:

[W]hether transfer of control of an investment advisor and principal underwriter at a price in excess of net asset value constitutes "gross misconduct or gross abuse of trust in respect to" an investment company which it serves, within the meaning of § 36 of the Act.

*Id.*

The court first examined the scope and content of the Act as a whole and pertinent legislative history. It noted that the Act's preamble enumerated only one objectionable circumstance to sales of office—the transfer of control without investor consent. *Id.* at 648–49. Pointing to § 15(a)(4), which requires that an investment adviser serve under a written contract and provides for automatic termination of the contract in the event of assignment, the Ninth Circuit found that:

No language used in this section [§ 1(b)], or elsewhere in the Act, indicates that the price paid for such a transfer of control is a circumstance to be considered.

.        .        .        .        .

Appellant [SEC] is   .   .   .   unable to point to any statutory provision which is specifically critical of the price paid for the transfer of control of a service company.

254 F.2d at 649.

Nor did the court "find any thing of consequence in the legislative history of the act" to support the SEC's contention that § 36 incorporated into the Act a general set of equitable principles. *Id.* at 651. Again, the court noted that it was the transfer of

control without consent which concerned the Congress. The Senate Committee Report and House Report comment only on the lack of prior knowledge or consent of investors when discussing problems in connection with the assignment of service contracts. *Id.* at 651, n. 15, *citing* S.Rep.No. 1775, 76th Cong., 3d Sess. and H.R.Rep.No. 2639, 76th Cong., 3d Sess.

The court discussed the contention that equitable principles applied to this case and concluded they had no application to the facts. It rejected as inapplicable the principle that a "person standing in a fiduciary relationship with another, may not sell or transfer such office for personal gain." 254 F.2d at 650. Since § 15(a)(4) operates to terminate a service contract automatically upon a shift in control, the court concluded that the "price received by [the investment adviser's directors] for the sale of their stock in the service company cannot be said to represent compensation for the sale or transfer of a fiduciary office involving Trust Fund." *Id.* In regard to the second equitable principle "that a person occupying a fiduciary relationship with another will not be permitted to exploit such relationship for personal gain, and in such manner as to deprive the other of assets to which he is entitled," *id.* at 650, the Ninth Circuit refused to adopt SEC's position that the price received by the investment adviser's directors for their stock, in excess of net asset value, represented the capitalized value of a Fund asset—namely, the contract between the service company and the Trust Fund. This value was not an asset of the Fund and the price received for the stock "did not come from the coffers of the investment company." *Id.*

The plaintiff, not surprisingly, suggests that *ISI* did, in fact, recognize that the

---

**2.** In truth, the Ninth Circuit's characterization of the SEC's position as one relying on § 36 may be misleading. Although the SEC was proceeding under § 36, in a prior Release Statement the SEC opined that the legislative history of *§ 15* showed that Congress intended to prevent all sales in investment advisory con-

tracts. S.E.C.Inv.Co. Act Release No. 394, CCH Fed.Sec.L.Rep. (1941–44 Transfer Binder) ¶ 73,281 (May 11, 1942) (emphasis added). The SEC did not answer the question of whether the provision in § 15 requiring stockholder approval was meant to be exclusive control on assignments.

sale-of-office rule was incorporated into the Act and distinguishes it on its facts.[3]

In *ISI*, the plaintiffs point out, the sellers of the stock in the investment adviser's officers did nothing to pass the office to the purchasers. "Unlike the present case where the transaction was conditioned upon a new advisory contract, in *ISI* the burden was on the purchasers to secure the reinstatement of the advisory contract from the stockholders of the mutual fund." (Plaintiff's Memorandum at 17.) In *ISI*, the advisory contract terminated by virtue of the sale and the new purchasers independently attempted to secure the reinstatement of the advisory contract from the stockholders of the mutual fund.

The plaintiff argues that the facts in *Rosenfeld* are wholly analogous to its case. In *Rosenfeld*, a vote of Fund stockholders was necessary to shift the advisory office from the old to the new adviser. The old adviser recommended to Fund stockholders that the chosen successor be approved. Its case, urges plaintiff Nizin, presents even a stronger case since, under the terms of the reorganization agreement, the transaction was expressly conditioned upon approval by the Fund stockholders of a new advisory contract to become effective when Western became the new owner of PMC.

While the plaintiff seeks to distinguish *ISI* on its *facts*, the Second Circuit seems to disagree with the *conclusions* reached by *ISI* regarding the application of general equitable principles to the facts even as *ISI* found them. The Ninth Circuit concluded that the investment adviser could not "sell" its fiduciary office within the meaning of

the equitable limitation because that office, along with its fiduciary duties, terminated upon sale of the office. In view of Lazard's role as organizer of the Fund and with its practical control of the proxy machinery used to recommend the approval of a new adviser, the *Rosenfeld* court found unpalatable the argument that Lazard, the investment adviser, could not have "sold" its advisory office within the meaning of the Act where by statute it terminated when control was assigned.[4] 445 F.2d at 1344. The court also disagreed with the conclusion that an advisory contract is not an asset of the Fund. It granted that such a contract was not "conceptually" an asset of the Fund, but found that it was also true "that the expectation of profits under that contract is not an asset which, under the Act, the adviser can assign outright." *Id.*

While the facts of *ISI* may be distinguished,[5] this court is not persuaded that the Ninth Circuit recognized any "implied incorporation" interpretation of the Act. Its discussion of the application of equitable principles reads more like dictum than like an alternate holding.[6] It is noteworthy that, when read in the full context of the decision, the discussion appears sandwiched between the court's conclusions that, on the one hand, there is no language in the Act suggesting Congress was concerned with sale of an adviser's office for profit and, on the other, that there is no legislative history of consequence. Thus, plaintiff's contention that *ISI* recognized an implied incorporation theory seems unfounded.

The Second Circuit disagreed with the conclusion impliedly reached by *ISI* that

---

**3.** "The Court's rejection of the Securities and Exchange Commission's position was not on the ground that these equitable principles had not been incorporated into the Act, but rather that the facts at bar did not constitute a sale-of-office." (Plaintiff's Reply Brief at 7–8.)

**4.** Judge Friendly's disagreement with the determination in *ISI* that, because of the operation of § 15(a)(4), no fiduciary office was transferred, appears well-founded. To this extent, this court recognizes the short-comings in *ISI* and notes those authorities cited by plaintiff which have criticized *ISI* on this ground. *See, e. g., Beverly Hills Federal Savings and Loan Assoc.*

*v. Federal Home Loan Bank*, 371 F.Supp. 306 (C.D.Cal.1973); *Technology Fund v. Kansas City Southern Indus., Inc.*, Civ.No. 71–2349 (N.D.Ill. May 22, 1972); 72 Harv.L.Rev. 1176 (1959); 68 Yale L.Rev. 113, 124–28 (1972).

**5.** On this basis, the plaintiff distinguishes two pre-*Rosenfeld* decisions that adopted the holding in *ISI*. *Goodman v. Von Der Heyde, supra; Krieger v. Anderson, supra.*

**6.** *See* Note, Mutual Fund Control-Transfer Profits: Congress, The SEC, and *Rosenfeld v. Black*, 58 Va.L.Rev. 371, 380, n. 48 (1972).

§ 15 constituted a "policy determination by Congress that compliance with these provisions was to be the exclusive protection to an investment company when there is a change in advisory office." 445 F.2d at 1344. In rejecting the exclusive remedy theory, however, the court quotes from a law review article which stated that "'the section on its face hardly compels the conclusion that it is the exclusive antidote for such conduct.'" *Id.* at 1345, *quoting* Note, Protecting the Interests of Mutual-Fund Investors in Sales of Management-Corporation Control, 68 Yale L.J. 113, 131 (1958).

The court then arrives at its implied incorporation theory by reading into the bare language of § 15(a):

> When Congress, in § 15(a), required shareholder approval of any new advisory contract, it must have meant an approval uninfluenced by any improper motivations on the part of the outgoing adviser-fiduciary.

Judge Friendly referred to its prior decision, *Brown v. Bullock,* 294 F.2d 415, 421 (2d Cir. 1961) (Friendly, J.), in which the Second Circuit held that a complaint by stockholders of an investment company that directors' annual approval of management contracts occurred without any real consideration of the merits was sufficient to allege a violation of § 15 which requires annual approval of a management contract. In interpreting shareholder "approval" to imply meaningful approval, the *Brown* court disagreed with the appellant's argument that the standards for the director's actions are measured by state law: "It is . . . unreasonable to suppose that Congress would have wished to permit its purpose to protect investors in all investment companies . . . to be frustrated if a particular state of incorporation should be satisfied with lower standards of fiduciary responsibility for directors than those prevailing generally." *Id.* at 421.

While Judge Friendly's attempt to extend the rationale enunciated in *Brown* to the facts in *Rosenfeld* is logically attractive, I think his interpretation goes beyond the meaning of § 15(a). The *Rosenfeld* court

and the plaintiffs in this case do not point to anything in the legislative history to support the implied incorporation theory.

*Rosenfeld* distinguished the actual holding of *ISI* on the basis that the SEC was proceeding under § 36 of the Act. While this literal distinction can be made, it is clear that the Ninth Circuit in *ISI* searched through the whole of the Act and all its legislative history to search for any relevant language or commentary concerning the sale of advisory offices for profit.

The Second Circuit also disagreed with the interpretation of the legislative history of 1970 amendments to the Act advanced by the appellees in that case and which were later accepted by another court. *Kukman v. Baum,* 346 F.Supp. 55 (N.D.Ill.1972). In 1970, Congress enacted an amendment which broadened the scope of § 36 of the Act to cover a breach of fiduciary duty involving personal misconduct while rejecting some SEC proposals. Act of Dec. 14, 1970, Pub.L.No.91–547, § 20, 84 Stat. 1428.

In a 1966 report, the SEC noted how common law principles of fiduciary responsibility had been diluted by operation of certain protective provisions of the Act, referring to the decision in *ISI* which held that the automatic termination provisions in the event of assignment meant there was no sale of fiduciary office. Although it disagreed with this conclusion, the SEC recognized that "application of the strict common-law principle might well be unfair insofar as it denies to the retiring management any compensation for the elements of value in the relationship which they may have built up over the years" and "could also be harmful to the Fund, since existing management might be reluctant to surrender that relationship and to provide the Fund with new and possibly more effective management." Public Policy Implications of Investment Company Growth, H.R.Rep. No.2337, at pp. 151–52, 89th Cong., 2d Sess. (1966). The SEC proposed that Congress amend § 15 of the Act to add a new provision which would not prohibit all transfers for profit, but only those "when it appears that the new relationship is likely to impose

additional burdens on the investment company, limit its future freedom of action, or subject it to other inequities." Spec.Rep. No.146 on S.1659, H.R.9510, "Technical Explanation of the Bill by the Securities and Exchange Commission," CCH Fed.Sec.L. Rep. (May 8, 1967) at 13. A substitute bill was introduced, however, in the Senate and the proposed amendment with its burden test was dropped.

The defendants here, and the court in *Kukman v. Baum,* conclude that the SEC abandoned the position taken in *ISI* regarding transfer of an advisory office for profit. Whether the amendments proposed by the SEC suggest they changed their beliefs or whether they merely reluctantly accepted the decision in *ISI,* as *Rosenfeld* would suggest, 445 F.2d at 1348, the more important question is what conclusion is to be drawn by Congress' failure to adopt the proposal.

This Court finds the analysis of the legislative history of the 1970 amendments in *Kukman* to be persuasive.[7] *See Equity Fund Inc. v. VRW Corp.,* CCH Fed.Sec.L. Rep. ¶ 93,698 (W.D.Wash.1972). (In a similar suit by a mutual fund to recover profits realized on a sale of its investment adviser, the court recognized the conflict between *Rosenfeld* and *ISI,* but found the *Kukman's* analysis of legislative history also to be more attractive.) After a thorough examination of the legislative history, the *Kukman* court concluded:

> Instead of accepting the SEC's burdens theory, Congress enacted amendments broadening section 36 of the Act. Congress also amended the Act to refine Section 15(a)(4) which provides for automatic termination of a management agreement upon its assignment. In passing those amendments, Congress cautioned that it did not intend (1) to single out transfer situations for special treatment, (2) to

provide a basis for the SEC to undertake a general revision of industry practices, or (3) to make a change in the substantive law providing safeguards upon the transfer of controlling shares of an investment adviser.

> Thus, aware of the decisions in the *Insurance Securities* and *Krieger* cases, Congress, in 1970, enacted comprehensive amendments to the Act but declined to alter the result of those cases.

346 F.Supp. at 64. In coming to terms with the Second Circuit's decision, *Kukman* found the treatment of the legislative history of the 1970 amendments in *Rosenfeld* both superficial and highly subjective. This court accepts the observations made in *Kukman.*

The 1975 amendments to the Act and its legislative history appear inconclusive in aiding this court in determining whether Congress had originally intended to prohibit the sale of an investment adviser's office for profit (in the situation either where the old adviser attempted to influence the selection of its successor or where there was merely an assignment). While the amendments specifically recognize the right of an investment adviser to profit from the sale of the adviser's interest which results in an assignment of an investment advisory contract, two safeguards are imposed on such sales. 15 U.S.C. § 80a–15(f)(1) (Supp.1979). Section 15(f)(1)(A) requires that for three years after the sale at least 75% of the investment company's directors be disinterested persons of the predecessor and successor investment adviser. Section 15(f)(1)(B) states that the transaction must not impose any unfair burden on the investment company.

These amendments were enacted according to the Senate Committee Report because the bill was needed "to clarify the law

7. In trying to find support in the legislative history when Congress originally enacted the Investment Company Act, the defendant referred to testimony by the SEC in a Senate subcommittee hearing in which Senator Taft suggested that specific fiduciary obligations be set forth in the bill for which a fiduciary would be criminally liable. *Hearings on S. 3580 Be-* *fore a Sub-committee of the Senate Committee on Banking and Currency,* 76th Cong., 3d Sess. 262 (1940). Although the SEC responded that such an obligation would be too onerous, the plaintiff notes that the SEC was reluctant to have criminal sanctions imposed for violation of these standards. The Congressional hearings on this bill would thus seem inconclusive.

in light of *Rosenfeld.*" Report of the Senate Committee on Banking, Housing and Urban Affairs on S. 249, S.Rep.No.94–75, 1975 U.S.Code Cong. & Admin.News at p. 179. These comments would appear to be capable of varying interpretations, none of which are clearly helpful to this court. Through the amendments, Congress could be said to have overruled and rejected *Rosenfeld.* On the other hand, the safeguards and limitations imposed on sales of investment adviser's offices might be considered a delineation of the holding in *Rosenfeld* and an acknowledgement that these restrictions had already been incorporated into the Act.

Judge Freedman in this district has also expressed "real doubts . . . as to the continuing validity of the holding in *Rosenfeld.*" *Schlusselberg v. Colonial Management Assoc. Inc.,* 389 F.Supp. 733, 739–40 (D.Mass.1974); *Marcus v. Putnam,* 60 F.R.D. 441, 445 (D.Mass.1973).

In *Schlusselberg,* the court determined the reasonableness of a proposed settlement in a shareholder derivative action brought against the controlling shareholders in an investment adviser's office who had sold their stock at a profit and influenced the renewal of the advisory contracts. In determining the strength of the plaintiff's case as a factor to be considered, Judge Freedman found two problems with respect to the *Rosenfeld's* implied incorporation theory. First, he found no legislative history to support such a theory and referred to the opinion of Judge Bauer in *Kukman. Id.* at 739. Secondly, he quotes from the First Circuit's decision in *Moses v. Burgin,* 445 F.2d 369 (1st Cir. 1971), aff'g in part and rev'ing in part, 316 F.Supp. 31 (D.Mass. 1970), cert. denied 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971), to support his belief that "this Circuit would not concur with the holding in *Rosenfeld.*"

Although *Moses,* as Judge Freedman noted, is factually distinguishable, Chief Judge Aldrich's comments about common law rules prohibiting fiduciaries from indulging in self-dealing, are instructive:

> We do not denigrate these principles, though we need hold relevant only their

expression through the federally imposed standard under section 36, which may vary from the state common law. *Moses,* 445 F.2d at 376.

He recognized that "because of the structure of investment trusts, self-dealing is not the exception but, so far as management is concerned, the order of the day." *Id.* Thus, the court was hesitant to imply that the common law principle against self-dealing should be so readily read into the Investment Company Act and looked to pertinent language of the Act to determine how Congress addressed the issue. The import of *Moses* is clear. Common law fiduciary principles should not be *assumed* to be incorporated into the Act.

I, therefore, conclude that the *Rosenfeld* decision should not be followed, and the defendants' motions for summary judgment should be granted.

Because of this conclusion, I do not think it necessary to determine the statute of limitations question. The parties stipulated that the plaintiff's cause of action accrued no later than September 30, 1968 and that the applicable statute of limitations is governed by Massachusetts law. The defendants argue that the applicable statute of limitations is M.G.L. c. 260, § 2A, the then two-year tort statute of limitations. Massachusetts cases are inconclusive as to whether the breach of fiduciary duty as it is presented in this case is a tort. I lean in the direction of "tort" but need make no definite commitment, since the foregoing analysis and decision are dispositive.